## ENTERPRISE COAL CO. v. PHILLIPS.
### No. 3079.

District Court, M. D. Pennsylvania.

Sept. 12, 1935.

Edwin W. Gearhart and Kelly, Balentine, Fitzgerald & Kelly, all of Scranton, Pa., for plaintiff.

Frederick V. Follmer, U. S. Atty., of Milton, Pa., and Frank J. Wideman, Asst. Atty. Gen., and Andrew D. Sharpe and Julian G. Gibbs, Sp. Assts. to Atty. Gen., for defendant.

WATSON, District Judge.

This is an action by a taxpayer, the Enterprise Coal Company, to recover from

the defendant, collector of internal revenue, the sum of $40,447.43 with interest from April 10, 1928, an income tax assessment paid under protest. By agreement, the case was tried before the court without a jury.

The taxpayer sought to deduct from its income for the year 1923 the following items: Operating expenses $115,887.65; loss on abandonment $101,157.47; depletion of culm bank $93,257.10. The disallowance of these deductions by the Commissioner of Internal Revenue resulted in the tax in question and the Commissioner's action is made the basis of this suit.

Some of the above-mentioned expenditures and losses were made and sustained in the years 1921 and 1922. Since the plaintiff had no profit in those years, it is not disputed that under the law as it then stood, the plaintiff was allowed to carry these items to the year 1923 when it allegedly had an operating profit.

The plaintiff bases its case upon the testimony of its two witnesses, Heinbokel and Jennings, and some documentary evidence. The issues involved are largely questions of fact depending upon this evidence.

The first major item in dispute is that of $115,887.65 which the plaintiff contends should be deducted as operating expenses and which the defendant contends are nondeductible capital charges. The rules governing the question whether an expenditure shall be charged to capital or to expense in the case of a mine are clearly determined by the standard accounting practice, the regulations of the Department of Revenue, and the decided cases. The serious questions in this case are whether the plaintiff has established the basic facts to show that the items in question are operating expenses and the application of the law to the established facts.

Section 234 (a) (1) of the Revenue Act of 1921 (42 Stat. 254) provides that in computing net income there shall be deducted from gross income "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." What is considered as ordinary and necessary expenses is shown by section 215 (a) (2) of the Revenue Act of 1921 (42 Stat. 242), which specifies that among items not deductible are "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."

The rules adopted in the standard accounting practice are set forth in the case of Marsh Fork Coal Co. v. Lucas (C. C. A.) 42 F.(2d) 83. Mr. William B. Reed in "Bituminous Coal Mine Accounting" lays down the following rules: "Charge to this account (Mine Plant and Equipment) the cost of Mine Buildings and structures, machinery, equipment, etc., purchased or constructed subsequent to February 28, 1913, or at the fair market value as at March 1, 1913, if purchased or constructed prior to that date. This account includes tipples, power houses, office buildings, side tracks, reservoirs, steam and water lines, machinery and equipment, mine cars, motors, steel rail, wiring, and all equipment necessary in the first instance to bring the mine into an operating condition."

"After the mine has been developed to its regular normal output capacity all additional expenditures for minor items of plant and equipment, necessary to maintain but not to increase production, such as motors, mules, mine cars, steel rail, copper wire, etc., should be charged to operation."

Mr. R. V. Norris, member and chairman of the coal subcommission of the American Institute of Mining and Metallurgical Engineers, stated the applicable rules as follows: "Operating Charges. There should be charged to operation all costs of production, all development, plant and equipment necessary to maintain output. All overhead expenses necessary in carrying on the business, all local taxes, depletion and depreciation." "Development. The cost of the development of a property to its intended output is properly chargeable to capital. All further development to maintain output is properly operating expense. A mine may be considered developed when there are sufficient working places to produce the designed output, and sufficient entry work in progress to replace exhausted areas and maintain output. Sufficient advance development should be maintained to assure beyond question the maintenance of output under unfavorable conditions." "Plant and Equipment. All plant and equipment necessary to bring the property to capacity is properly a capital charge. All additions, renewals and extensions necessary to maintain output should be charged to operation."

The rules laid down by the Council of the Institution of Mining and Metallurgy (Dicksee, "Mines Accounting and Management," p. 78) are as follows: "After the producing stage is reached, no expenditure should be charged to capital account except large special items, such as (1) Purchase of additional property: (2) Sinking of new main shafts to reach ore bodies; (3) Erection of additional buildings, machinery, plant, or surface works which may be necessary either to increase output, to improve recovery, or to decrease costs. Such items of capital expenditures should bear their proportion of the administration and general charges. If any existing shafts, machinery, plant or buildings should be entirely superseded and replaced, the cost of the old items should be written off capital to profit and loss either at once (if small) or in the case of large items by installments spread over as short a period as the responsible engineer may recommend. All repairs, maintenance and replacements of minor machinery and plant should be charged to working costs."

The same general rules have been approved in the regulations of the Revenue Department issued under the Revenue Act in question: "Article 222. *Allowable Capital Additions in Case of Mines.*— (a) All expenditures for development, rent, and royalty in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion, while the mine is in the development stage. Expenditures made in order to maintain the mine at its normal output shall be deducted as an expense in the year in which the expenditure is made or accrues. Any expenditure for extraordinary development and equipment such as stripping, shaft sinking, tunneling, and other work beyond that necessary to maintain the mine at its normal production or output, should be carried forward and apportioned and deducted as an operating expense in the years to which it is applicable. (b) All expenditures for plant and equipment shall be charged to capital account recoverable through depreciation, while the mine is in the development stage. Thereafter the cost of major items of plant and equipment shall be capitalized, but the cost of minor items of equipment and plant, necessary to maintain the normal output, and the cost of replacement may be charged to current expense of operation."

■ The adjudicated cases hold expenditures for such minor equipment as mine car wheels, mine cars, switches, trolley wires, and rails necessary to maintain normal production after the mine had reached its maximum development are chargeable to expenses. United States v. Roden Coal Co. (C. C. A.) 39 F.(2d) 425, 426; Marsh Fork Coal Co. v. Lucas (C. C. A.) 42 F. (2d) 83; Commissioner of Internal Revenue v. Brier Hill Collieries (C. C. A.) 50 F.(2d) 777. In the Roden Case the court said: "In view of the conclusions of the District Court that the mine had been completely developed before the purchase of the various items, that they were necessary to maintain the regular and normal output, that none of them increased the output or decreased the cost of production or increased the capital value of the property, they could hardly be considered improvements."

■ To support its theory that the expenditures in question were operating expenses, it is plain that the fundamental fact to be proved by the plaintiff is that the mine had been completely developed before said expenditures were made. The same item of expenditure may be classed as capital if the mine has not reached its normal development or as an operating expense if the mine has reached its normal development. It is significant that the record is devoid of any testimony whereby the court can find whether or not the mine had reached a stage of complete development. It is true that some inferences may be drawn from the fact that the mine had been operated for a number of years and that there was some second mining being done, but, on the other hand, there are inferences that there was major construction and work done beyond that necessary to maintain the mine at normal production which increased production, efficiency, and capital value. The court is not warranted in making a finding without support of adequate and reliable testimony.

Assuming that the plaintiff proved that the mine had reached its normal development, it has failed to meet the burden of showing that the expenditures were for minor items necessary to maintain the normal output. Both of plaintiff's witnesses testified that the expenditures did not increase the production, but their testimony is confronted with the fact that after the expenditures were made there was a mark-

ed increase in production. Plaintiff accounts for this in part by the commencement of production from a culm bank. In its brief it accounts for the balance of the increased production by attributing it to increased demand. However, the plaintiff introduced no testimony to show that the market condition was a factor.

The conclusion that the sum of $115,887.65 should be capitalized is further strengthened by a consideration of the component items and the testimony concerning them. There was expended $7,630.10 in regarding No. 10 tunnel; $3,906.32 in 1921 for enlarging No. 1 tunnel; $9,547.20 for jigs and rolls to replace pickers that were not capable of taking care of the coal that was then mined; and $5,802 for mine car repairs and replacements, representing the amount of expenditures which was not allowed as a deduction by the Commissioner out of a total expenditure on mine cars of $15,885.09. It is significant that these four items totaling $26,885.62 were considered as capital assets by the plaintiff when it filed with the Internal Revenue Department a sworn income tax protest for the year 1921. Mr. Bell, the auditor employed by the plaintiff at that time, and under whose supervision the protest was prepared, testified that in his opinion it was correct. In 1922 and 1923 an additional amount of $4,015.17 was expended on No. 1 tunnel, for the same purpose as above mentioned. Plaintiff's witness Heinbokel testified that the expenditure of $573,12, expended in driving a short tunnel, was for the same purpose as the item of enlarging the said No. 1 tunnel. There is an inference from the testimony relating to an expenditure of $4,713.67 on slope No. 8 that this was development work on a shaft driven in solid coal. The expenditure of $1,693.29 in replacing casings of bore holes was necessary according to the testimony to protect the mines so they could continue running. The sum of $78,006.78, composed as follows, labor $49,216.11; lumber $20,471.80; and other material $8,318.87, was expended on the breaker. According to the witness Heinbokel, it was "rebuilt, repaired, renewed." This large expenditure cannot be considered as a minor item of plant and equipment, but must be considered as a major capital item of permanent improvement or betterment to increase the value of the property. The plaintiff has not established that this renewed breaker did not increase production.

After careful consideration of the item of $115,887.65 and its component parts, the court is of the opinion that the plaintiff has not met the burden of proof and has failed to establish that the mine had been completely developed before the expenditures in question were made, that the expenditures were for minor items necessary to maintain the normal output, and that none of them increased the output or decreased the cost of production or increased the capital value of the property.

The second major item in dispute is that of $101,157.47 for losses suffered, which the plaintiff contends should be deducted as a result of abandonment of certain assets. The pertinent regulation of the Department of Revenue on the subject of abandonment is article 143 which provides: "When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the cost, or, if acquired prior to March 1, 1913 the fair market price or value as of that date of any assets so discarded (less any depreciation sustained and allowable as a deduction in computing net income) and its salvage value remaining. * * *" The plaintiff computed its loss by basing the fair value of the assets abandoned on figures set up in an inventory taken November 1, 1910, and then calculated the rate of depreciation thereon at 2½ per cent. to the date of abandonment. The loss claimed was the difference between the inventory figures and the cumulated depreciation.

The disposing question is whether the plaintiff has established a fair market price or value as a basis for computing its loss. It is the defendant's contention that the plaintiff has not only failed to establish a reliable 1913 value, but has failed to show the date of acquisition and probable life of the assets abandoned. The plaintiff admits that it has no cost vouchers and that it cannot show the cost of the assets abandoned. It relies on an inventory taken November 1, 1910. This inventory does not show the date of acquisition of the assets. The makers of the inventory are unknown and the plaintiff's witnesses did not show the date of acquisition and the probable life of the abandoned assets or the

nature of the inventory, whether it represented cost price, actual value, or other valuation. The amount of loss computed naturally depends upon whether the basis for computation is cost, or valuation. The inventory of November, 1910, for example, might set up an item which in fact was purchased in 1900 at its actual cost of $1,000, its valuation in 1900 as $1,500, or its depreciated value in 1910, the date of the inventory as $500. The plaintiff is unable to show the nature of the inventory and therefore cannot establish a reliable value as of 1913. The loss sustained through abandonment cannot be determined and therefore cannot be allowed in the absence of reliable proof of cost, or value as of March 1, 1913, the date of acquisition, and the probable life of the abandoned assets. Appeal of Co-operative Foundry Co., 2 B. T. A. 888.

The third item in dispute is that of $72,385.12, which the plaintiff claims should be deducted for depletion sustained on the coal taken and sold from its culm bank. Section 234 (a) (9) of the Revenue Act of 1921 (42 Stat. 254), which allows deductions for depletion, provides as follows: "In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: Provided, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date." Article 203 of the regulations of the Department of Revenue provides: "Amount returnable through depletion and depreciation deductions in the case of lessee: (a). In the case of a lessee, the amount remaining in any year returnable through depletion and depreciation deductions is (1) the value, as of the basic date of the lessee's equity in the property plus (2) subsequent allowable capital additions but minus (3) depletion and depreciation sustained, whether legally allowable or not, from the basic date to the taxable year and the residual value of other property at the end of operations. The amount returnable through depletion is the total capital remaining less the sum recoverable through depreciation. (b). The value of the equities of lessor and lessee shall be computed separately, but, when determined as of the same basic date, shall together never exceed the value at that date of the property in fee simple. (c). The value of the lessee's equity, if acquired prior to March 1, 1913, is the value of his interest in the mineral as of that date."

The defendant contends, among other things, that the plaintiff has not substantiated a reliable March 1, 1913, value of the culm bank nor the correct tonnage. Plaintiff's witness Heinbokel used the sum of 75 cents per ton of culm as the 1913 value, but it was admitted that he did not make the valuation. For the valuation, plaintiff relies on the testimony of its witness Jennings, a former superintendent of the plaintiff company, who testified as to the value of a ton of culm: "I very often thought to myself that a man could afford to pay a dollar a ton right out for that coal and build a washery." "I would put a dollar a ton on it myself." The witness did not testify whether this was a valuation of the lessee's equity or of both the lessor and lessee. The defendant's witness Phillips, a valuation engineer in the Bureau of Internal Revenue, showed that he had a knowledge of the value of culm banks and the reports of various coal companies therein throughout the region; that the culm material, which contains rock and slate, was never valued, but the value was placed on the tonnage of coal therein; that the 1913 values were not high; that the value of culm was not in excess of fresh mined coal; and that the value of the lessee's equity in this culm bank coal was not in excess of 10 cents per ton. In many cases it is significant that as to fresh mined coal, which is more valuable than culm bank coal, the agreed valuation as well as the valuation determined by the Board for depletion purposes ranged from 3 cents to 10 cents per ton. Appeal of Steele, 2 B. T. A. 164; Commissioner v. Brier Hill Collieries (C. C. A.) 50 F.(2d) 777; Banker's Pocahontas Coal Co. v. Commissioner, 18 B. T. A. 901; Sunnyside Coal & Coke Co. v. Commissioner, 9 B. T. A. 984. While the valuation varies in different cases, the testimony of the witness Phillips is supported by the above cases.

After careful consideration of the testimony, the court is of the opinion that the plaintiff has failed to show the 1913 value of the culm bank by any substantial and reliable evidence. In view of this conclusion, it is not necessary to discuss the

remaining contentions of the defendant on this point.

On the whole case the evidence is not substantial and is unreliable, and is insufficient to support a judgment in any amount in favor of the plaintiff and against the defendant in this cause.