**GUANACEVI MINING CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9935.

Circuit Court of Appeals, Ninth Circuit.

April 6, 1942.

Nathan Moran, of San Francisco, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Joseph M. Jones, and Alvin J. Rockwell, Sp. Assts. to the Atty. Gen., for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This matter is before us on petition of the taxpayer to review a decision of the United States Board of Tax Appeals adjudging deficiences in income tax for the years 1935, 1936, and 1937. 43 B.T.A. 517. The facts, found by the Board, are substantially as follows:

Petitioner, a California corporation with its principal office in San Francisco, is the owner of mining property in the state

of Durango, Mexico, probably near the lugar Guanacevi. The property has been worked since Spanish colonial times, yielding silver and a small amount of gold. It lies in a region difficult of access, and before 1931 the ore was primitively extracted under the "gambucino" method by workers who brought it out in cowhide baskets.

Guanacevi Mining Company leased out the property in 1905 and thereafter, until July 20, 1931, when it terminated the lease. During that period it received from the lessee royalties on the ore extracted. By 1929 the exhaustion of high grade ore made primitive operation unprofitable. The petitioner then caused an extensive survey and borings to be made on the property to determine whether available low grade ore was sufficient to warrant an investment in modern machinery, tunnels, and a mill. As a result of the survey and anaylsis of the borings, the surveying engineer recommended expenditures for further operation on the basis of his estimates. Some of the ore bodies examined in the survey were the same as had already been mined by primitive methods; there were some small discoveries.

Subsequently to July 20, 1931, the petitioner commenced driving two tunnels into separate ore bodies which previously had been worked near the surface, and began construction of a mill to which the ore could be hauled on cars. As was anticipated, no new bodies of ore were discovered in the course of driving the tunnels. Up to August 1, 1934, the date of completion of the mill and beginning of production, the petitioner, using borrowed capital, had expended $123,785.45 on the[1] tunnels and operating devices; during the remainder of the year it spent $11,045.25 on development; in 1936 it spent $6,858.59; and in 1937, $6,154.74. The available ore was first estimated at 122,947 tons; this estimate was increased in 1936 by 9,278 tons and in 1937, by 7,214 tons. In 1934 the petitioner extracted 8,940 tons; in 1935, 24,645; in 1936, 30,076; in 1937, 33,494; and in 1938, 32,822. The mine, nearing exhaustion at the time of the decision below (Feb. 4, 1941), was then producing about 300 tons a month. After exhaustion of the ore the tunnels will be of no use to petitioner.

On December 31, 1935, 1936, and 1937, the unpaid amounts of the borrowings with which petitioner had constructed the tunnels, mill, and operating equipment were $300,133.95, $255,038.41, and $200,465.15, respectively. During these years petitioner paid interest of $15,337.93, $11,963.26, and $7,235.87, which it treated as a capital expenditure in computing its allowance for depletion. Depletion deductions, computed on the basis of a percentage of income from the property, were claimed and allowed.

Petitioner paid no dividends. Its indebtedness in October, 1940, was about $51,000. Its only source of income was its Mexican mining operation.

The questions, three in number, will be stated separately.

The petitioner first contends that it is entitled to deduct the expenditures on its haulage tunnels from gross income as deferred *operating costs* allocated to the ores extracted in the years in question, according to the tonnages recovered. Appellant argues in support of this contention that the cost of the tunnels was an operating expense deductible in the year the ore was extracted and sold, that petitioner was operating a mine which was past the development stage; that the mine was on a strict production basis; that the tunnels were driven solely for extraction (as distinguished from discovery) of known and prevalued ores. The Commissioner took the position that the cost of the tunnels was a development expense to be capitalized and recovered through deductions for depletion; that since petitioner elected to have its depletion allowance computed on the percentage basis no further depletion deduction would be allowed based on cost. The Board of Tax Appeals sustained the Commissioner.

The law is set out in a marginal note.[2]

---

[1] At this place the Board's finding included the word "mill." This is not the fact, and at the suggestion of petitioner, acquiesced in by respondent, the word "mill" is here omitted.

[2] Revenue Act of 1934, 48 Stat. 680, 688, 689:

Sec. 23.   Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

\*     \*     \*     \*     \*     \*

"(m) Depletion. In the case of mines, \* \* \* a reasonable allowance for depletion \* \* \*, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be pre-

Under the heading of "Allowable capital additions in case of mines," Article 23(m)—15 of Regulations 86, promulgated under the Revenue Act of 1934, it is provided that "All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage." A mine is "considered to have passed from a development to a producing status * * * when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining." The term "development," as used in the regulation, may or may not be susceptible of precise definition. Lindley (on Mines, 3d Ed., vol. 1, § 282, pp. 634, 635) seems to believe exact definition of mining terms both difficult and dangerous owing to the technical nature of the subject and the different conditions and surroundings in mining districts. We are certain, however, that the use of the term "development" is not to be restricted to "discovery" or "exploration." The teaching of the opinions in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83, 85, 86, and Enterprise Coal Co. v. Phillips, D.C.Pa., 12 F.Supp. 49, 50, 51, affirmed 3 Cir., 84 F.2d 565, impress upon us that if an expenditure is made to *attain* an intended output, it is properly chargeable to capital as a cost of development; if the expenditure is made to *maintain* an output, it is properly chargeable to operating expense.

We may state, from the findings of the Board, that the high grade ores (for practical and profitable extraction) had been exhausted by 1929; that the lease was terminated July 20, 1931; that the mine did not produce any ore between that date and August 1, 1934. This means that there was no normal output of ore during that period; the normal output had ceased. The low grade ores were made available for working by the driving of the two tunnels, without which petitioner would have been unable profitably to extract the low grade ores. The tunnels made available these ores which were theretofore inaccessible. It follows that the expenditures in question were made for the purpose of *attaining* an output, not of *maintaining* an output, and were, therefore, "development" expenses, properly chargeable to capital, to be recovered through depletion deductions. See 2 Paul and Mertens, Law of Fed. Inc. Taxation, § 21.40, pp. 737-741; Blockton Cahaba Coal Co. v. United States, 5 Cir., 24 F.2d 180, 181.

The petitioner relies upon G.C.M. 13954 (XIII-2 Int.Rev.Cum.Bull., p. 66) as support for its claim that the expenditure in question be treated as a deferred mining expense. This able and exhaustive opinion has been studied with care, and, as a result, we are forced to conclude that the opinion is also persuasive authority for the respondent. Although the question before us may well be essentially one of fact (cf. Enterprise Coal Co. v. Phillips, D.C.Pa., 12 F.Supp. 49, 51; G.C.M. 13954) and therefore, in the state of the record, closed to appellate review, we have elected to treat of it as a mixed question of law and fact in order to avoid what might appear arbitrary action.

The second question presented by the taxpayer's petition relates to the treatment of interest paid by petitioner on borrowed capital. As heretofore stated, in out-

scribed by the Commissioner, with the approval of the Secretary. * * *" 26 U.S.C.A.Int.Rev.Code § 23(m).

Sec. 24. Items not Deductible. [48 Stat. 691]

"(a) General rule. In computing net income no deduction shall in any case be allowed in respect of—

* * * * * *

"(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate; * * *." 26 U.S.C.A. Int.Rev.Code § 24(a) (2).

Sec. 114. Basis for Depreciation and Depletion. [48 Stat. 710]

"(b) Basis for depletion

* * * * * *

"(4) Percentage depletion for * * *

metal mines * * *. The allowance for depletion under section 23(m) shall be, * * * in the case of metal mines, 15 per centum, * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property. * * *"

Corresponding sections of the Revenue Act of 1936, 49 Stat. 1648, 1660, 1662, 1686, are to the same effect. Barton and Browning, Federal Income and Estate Tax Laws, 8th Ed., pp. 44, 56, 178.

lining the facts, the petitioner paid out, in the years 1935, 1936, and 1937, sums of money as interest on capital borrowed for construction work. These expenditures for interest the petitioner treated as capital expenditures, as respects depletion allowance; the Commissioner treated the interest as an expense of mining operations, thereby reducing the Company's net income. The petitioner objected to this determination, but the Board sustained the Commissioner.

Section 114(b) (4) of the Revenue Act of 1934, heretofore quoted, refers to "gross income from the property" and to "net income * * * from the property," which terms are defined in Internal Revenue Regulations 86, Art. 23(m)—1(h), as follows:

" 'Net income of the taxpayer (computed without allowance for depletion) from the property,' as used in section 114(b) (2) * * * means the 'gross income from the property' * * * less the allowable deductions attributable to the mineral property upon which the depletion is claimed and the allowable deductions attributable to the processes listed in paragraph (g) in so far as they relate to the product of such property, including overhead and operating expenses, development costs properly charged to expense, depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion. * * *"

It is to be noted that the allowable deductions listed as examples in the above regulations are not exclusive.

The taxpayer argues that interest on borrowed capital is neither attributable to the mining property nor to the processes which are part of the mining operations.

In Sheridan-Wyoming Coal Co. v. Helvering, Commissioner, App.D.C., 125 F.2d 42, 44, 45, the Court of Appeals for the District of Columbia had the identical question, here presented, before it, which it decided adversely to the petitioner's contention. The court said:

"* * * In our opinion the Board correctly upheld the Commissioner's determination that the disputed items were properly considered in computing the allowable deduction, pursuant to the provisions of the Treasury Regulations.

"In Helvering v. Wilshire Oil Co., Inc. [308 U.S. 90, 102, 60 S.Ct. 18, 84 L.Ed. 101], the Supreme Court held that such regulations were clearly within the power of the Commissioner to promulgate under the provisions of Section 23(l) [Revenue Act of 1928, corresponding to Section 23(m) Rev.Act of 1934, supra]; and that the regulatory power thus conferred extended to the percentage depletion allowance under Section 114(b). Specifically, the Court said: 'Here the Congress has not prescribed a precise formula free from all ambiguity. The ambiguous phrase "net income * * * from the property" was susceptible of various meanings and hence administrative interpretation of it was peculiarly appropriate, as we have said. And there were special reasons growing out of the complex nature of the depletion problem as it is treated for purposes of the income tax, for requiring the Commissioner to make precise the vague elements of that formula.' This language is equally applicable to the present case and to the pertinent sections of the 1934 Act. While the items in dispute in the Wilshire case concerned development expenditures rather than bond expenses, nevertheless the decision was made to turn upon the propriety of administrative interpretation in making precise the vague elements of the formula as applied to the admittedly borderline cases between deductible business expenses and non-deductible capital outlays, which arise in the practical administration of the statute. The facts of the present case fall as clearly within that reasoning as do the facts of the Wilshire case itself. * * *"

See, also, St. Marys Oil & Gas Co. v. Commissioner, 42 B.T.A. 270, 272; Mirabel Quicksilver Co. v. Commissioner, 41 B.T.A. 401.

█ Petitioner's third and final question is fully answered by the decision of the Supreme Court in Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29. The petitioner complains that the Commissioner erred in assessing against it for the years 1936 and 1937 the surtax upon undistributed profits under Sec. 14(b) of the Revenue Act of 1936, 49 Stat. 1648, 1656, 26 U.S.C.A. Int. Rev.Acts, page 823. It is argued that the petitioner paid no dividends in 1936 or 1937 because it was heavily in debt and to do so was contrary to the General Corporation Law of the state of California (Civil Code Calif. § 346), which declares that dividends may not be paid except out of earned surplus. However much we feel impressed by the apparent inequities of the situation, we are forced to conclude that the question is no longer open to argument since the decision of the Supreme Court in Northwest

Steel Rolling Mills case, supra, and Crane-Johnson Co. v. Helvering, 311 U.S. 54, 61 S.Ct. 114, 85 L.Ed. 35.

The decision of the Board of Tax Appeals is affirmed.