### ALSTEAD COAL CO. v. YOKE, Collector of Internal Revenue.

### Civ. No. 267-F.

United States District Court
N. D. West Virginia, Fairmont Division.

March 29, 1952.

O. E. Wyckoff and E. Bailey Wyckoff, of Grafton, W. Va., for plaintiff.

Richard M. Roberts, Special Asst. to Atty. Gen., and Howard Caplan, U. S. Atty., Clarksburg, W. Va. (Ellis N. Slack, Acting Asst. Atty. Gen., and Andrew D. Sharpe, Special Asst. to the Atty. Gen. on brief), for defendant.

WATKINS, District Judge.

The question here is whether certain expenditures, most of which were made by taxpayer between March 1, 1945 and June 15, 1945, constituted development costs to be capitalized and recoverable through depletion, or whether they were ordinary and necessary business expenses to be deducted in full during the fiscal year. The taxpayer treated these expenditures of $35,535.85 as operating expense in making its tax return. The Commissioner of Internal Revenue held that such expenditures constituted development costs, and made deficiency assessments, which were paid under protest. Taxpayer has brought this action to recover $22,450.26, the amount of assessments paid with interest from date of payment.

There is no dispute as to the material facts. About 1917 Consolidation Coal Company fully developed that portion of the Pittsburgh seam of coal which was situate near Gypsy, W. Va., making all the necessary headings and openings for such development. It continued to operate the Gypsy mine as a developed mine until 1928, when economic conditions in the industry and general exhaustion of the Pittsburgh

seam of coal· caused it to cease mining coal at the Gypsy mine. When it ceased operations, Consolidation had mined out the portion of the coal which was easiest to extract, and only pillar coal remained.

For the next 17 years the mine remained dormant. During this period much water accumulated in the mine, the supporting timber had rotted, and roof falls had accumulated much debris in the headings and rooms of the mine. In this condition Alstead acquired the property in 1945 with a view to mining the pillar coal remaining therein by modern mechanized operations. Previous operations had been by hand-loading method.

In January, 1945, pumps were placed in the manway heading for the purpose of draining accumulated water from the mine, and as the water was pumped from the mine the pumps were extended further into the manway heading, additional pipe was laid and electric wire strung. Pumping of water, clearing of debris, retimbering, laying of rails, stringing electric wire, and similar work continued until June 15, 1945, when the first coal was mined. It was necessary to clean and drain the headings to allow men to pass in and out of these headings. The manway heading was cleaned of debris and retimbered to gain access to the pillar coal and to make it safe for use. Track was laid and wires strung as the cleaning and retimbering progressed. Until the mine was thus drained, cleaned and retimbered, there could be no production of pillar coal. A new tipple was constructed and a mine track was laid by Alstead from the tipple site to its pitmouth at the old manway heading. The site of the tipple constructed by Alstead and the pitmouth used by Alstead were different from those utilized by Consolidation. Alstead used the old manway heading as its pitmouth entry to the coal, instead of using the main haulway previously used by Consolidation for that purpose. The old Consolidation manway on which so much work was done served to provide access to the coal to be mined, for ventilation of the mine, for haulage of coal from the premises, as a drainway, and a supply road. After June 15 the haulway was extended as mining progressed. On completion of cleaning and retimbering for a distance of about eleven hundred feet to the junction of the manway and main haulway, removal of coal was begun on June 15, 1945. The questioned expenditures for this work of preparing the mine so that coal could be mined amounted to $35,535.85, of which amount the sum of $1,629.94 represented cost of labor in the building of the track from Alstead's pitmouth to its tipple, and $756.92 represented cost of material used in construction of the tipple.

Within a period of eleven days after production started on June 15th, the mine had three or four working places for the mechanized operations, the same number. as were maintained in July and August. For the last half of June, 4,752.30 tons of coal were mined and in July, August and September about 13,000 tons were mined each month. After the mine was once prepared for operation as described above, Alstead was able to maintain its production by cleaning and retimbering additional working space as needed, and without interrupting its normal production of coal.

Alstead claims that since the mine was developed by Consolidation back in 1917, it cannot go through another development stage. It contends that once a mine is fully developed and production is normally maintained, it can never again be the subject of capital investment or development by reason of cleaning away debris, retimbering, and other similar work, irrespective of how long the mine may have remained dormant, or what may have happened to the mine in the meantime by reason of slate falls, explosions, or anything else. The government's contention to the contrary, however, is based upon the grounds that Consolidation may have developed the mine for the purpose of mining virgin coal but that it had never been actually developed for the retreat mining of pillar coal which was the taxpayer's method of extraction, and in the second place, that even granted Consolidation had completely developed the mine some 28 years previously, there is nothing in the Code or Regulations to preclude a second development period being undertaken with regard to reaching new

deposits and augmenting the extraction of coal. The government also contends that all of the $35,535.85 expenditures by the taxpayer were made to *attain* rather than to *maintain* production, and therefore constituted development cost.

Under the heading "Allowable capital additions in cases of mines", Sec. 29.23(m)-15 of Treasury Regulations 111, promulgated under the Revenue Act of 1934, it is provided that, "All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage". A mine is "considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining."

Production did not begin at this mine until after the questioned expenditures were made. Neither of the conditions mentioned in the quoted regulations existed prior to June 15. The expenditures were made to *attain* an intended output of pillar coal and were therefore chargeable to capital as a cost of development. They were not expenditures to *maintain* an output of coal so as to be properly chargeable to operating expense.

In Guanacevi Mining Co. v. Commissioner, 9 Cir., 127 F.2d 49, the taxpayer had leased a Mexican gold mine to another party who conducted operations on a rather primitive basis for 30 years until the mine was about exhausted. There had been no operations for about five years. The taxpayer conducted exploratory operations and constructed new tunnels and a mill to mine the low grade ore. The taxpayer sought to deduct such expenditures as ordinary business expense for maintaining current production, claiming that the mine had already been developed. In holding for the government the Board of Tax Appeals stated in part:

"The new cost was not to maintain production by continuing existing

methods, but to institute a new method and provide for new production. In practical effect it was an investment in a new mining venture with a new period of development. It was not unlike the opening of a newly discovered mine * * *". 43 B.T.A. 517.

In affirming the Board, the Court of Appeals Guanacevi Mining Co. v. Commissioner, 9 Cir., 127 F.2d 49, 51, said:

"The teaching of the opinions in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83, 85, 86, and Enterprise Coal Co. v. Phillips, D.C.Pa., 12 F.Supp. 49, 50, 51, affirmed 3 Cir., 84 F.2d 565, impress upon us that if an expenditure is made to *attain* an intended output, it is properly chargeable to capital as a cost of development; if the expenditure is made to *maintain* an output, it is properly chargeable to operating expense."

In Marsh Fork Coal Co. v. Lucas, supra [42 F.2d 86], Judge Parker quoted R. V. Norris, member and chairman of the coal Sub-Committee of the American Institute of Mining and Metallurgical Engineers who defined "development" of coal mining property as follows:

"The cost of the development of a property to its intended output is properly chargeable to capital. All further development to maintain output is properly operating expense."

Here the pillar coal was made available for mining by converting a manway to a haulageway, thereby providing ventilation for the mine, a haulageway for the coal, a drainway and a supply road. None of the expenditures was to maintain production. Taxpayer's engineer testified that before the pillar coal could be mined it was necessary to clean all these rooms and headings so that it would allow men to pass in and out of the mine; that in some instances the timbers had rotted and where there were no timbers the roof had fallen and left a dangerous condition; that before the pillar coal could be mined it was necessary not only to clean all these rooms and headings but to retimber them so that it

would be safe to work; and that the work done prior to June 15 was in getting the mine ready to operate,—"preparing these particular headings to reach a point where they could start mining". The expenditures made the pillar coal available, and without such expenditures Alstead would have been unable to extract such coal. The expenditures made available that coal which was theretofore inaccessible. The fact that a mine has once been developed does not mean that at a later date there cannot be a new development. Guanacevi Mining Co. v. Commissioner, supra; Consolidated Mutual Oil Co. v. Commissioner, 2 B.T.A. 1067.

As an alternate proposition taxpayer says that if the work in cleaning and timbering the mine prior to June 15 was development, it must follow that similar work done after that date during the months that followed would also be development. I cannot agree.

Taxpayer's engineer testified that the contemplated production was attained by June 26. He further testified that all work done in July, August and September was to maintain that production. The same process of cleaning rooms and headings and re-timbering was followed after the mine reached its production stage in order to maintain that contemplated production.

The expenditures in question, all made prior to the production of any coal on June 15, were made for the purpose of *attaining* an output and not of *maintaining* an output, and were therefore development expenses, properly chargeable to capital to be recovered through depletion deductions. The expenditures thereafter made were made to maintain production and chargeable as operating expenses.

Defendant admits that in figuring the deficiency assessments, June 30 was figured as the date on which production was started instead of June 15, the correct date. Because of this error the defendant concedes that plaintiff is entitled to judgment in the amount of $764.52, plus interest from February 15, 1945. An order may be entered accordingly.