OPINION. Turner, Judge: Simply stated, the question is whether during the years 1947 and 1948 petitioner’s Mine No. 4 was in a “development stage,” or in “a producing status,” within the meaning of section 29.23 (m)-15 of Kegulations 111.[1] By that regulation, it is provided that “All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage,” and further, that “The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.” The regulation is one of long standing, and both parties accept its validity. While the term “development” has not been given a precise definition under the regulations or in the cases decided, and may not be susceptible of such a definition, it has been held that its use “is not restricted to ‘discovery’ or ‘exploration,’ ” and further, that a mine, though previously and for an extended period in a production status, may again be in the development stage within the meaning of the regulation, even though the new development was not that of other or newly discovered bodies of ore but of ore bodies which previously had been worked. Guanacevi Mining Co. v. Commissioner, 127. F. 2d 49, affirming 43 B. T. A. 517. See also Alisted Coal Co. v. Yoke, 200 F. 2d 766. In the Guanaoevi case, the question was as to the deducti-bility as operating expenses of the cost of driving two new tunnels into known bodies of ore “which previously had been worked near the surface” but in which production had been suspended because the previously developed high grade ore had been exhausted and the driving of the two new tunnels was essential and necessary to the subsequent mining of the remaiñing low grade ore, which a survey had indicated could be mined at a profit. As in the instant case, substantial quantities of ore were produced in each of the years involved, and the argument advanced by the taxpayer was substantially the same as the argument of the petitioner here. There it was argued “that the cost of the tunnels was an operating expense deductible in the year in which the ore was extracted and sold, that petitioner was operating a mine which was past the development stage; that the mine was on a strict production basis; that the tunnels were driven solely for extraction (as distinguished from discovery) of .known and prevalued ores.” Holding that the cost of the tunnels was development expenses within the meaning of the regulation, the court said: The tunnels made available these ores which were theretofore inaccessible. It follows that the expenditures in question were made for the purpose of attaining an output, not of maintaining an output, and were, therefore, “development” expenses, properly chargeable to capital, to be recovered through depletion deductions. * * * In support of its conclusion, the court cited Blockton Cahaba Coal Co. v. United States, 24 F. 2d 180, 181. In our opinion, the same conclusion is required in the instant case. There are some factual differences, but they are not distinguishing differences. By reason of petitioner’s inability to mine the adjacent coal as the driving of the entryways progressed, due to ceiling conditions, it could mine the coal only by the retreat method of mining after the entryway had been driven to a fixed or predetermined point, and because of its inability to extend entryway 1-South and thereby turn cross-entryways to enable it to do such mining, it was, for all practical purposes, as effectively cut off from its main ore body as was true in the Guanacevi mine, and before it could again resume a production status it was an essential and a prerequisite that the new system of entryways be driven and completed. It is, of course, true that throughout 1947 and 1948 petitioner was producing substantial amounts of coal from the entryways and the accompanying airways, but that was only a part of the operation. Large amounts of shale above the coal seam were removed to provide headroom and secure a firm ceiling for the subsequent use of the entryway. Tracks were laid and wiring installed not merely for the removal of the coal thereafter to be taken from the entryways and the accompanying airways, but to provide a permanent avenue for the removal of coal from the rest of the mine. The regulation obviously takes into account the fact that while the mine is in the development stage there will most likely be some production of coal and that after the mine has passed from development to a producing status some development work will be necessary to maintain normal production, but incidental development work carried on while a mine is in a producing status will not, under the regulation, cause the mine to be considered to be in the development stage, nor will incidental production while the mine is in the development stage require that the mine be considered to be in a producing status. The evidence shows, and we have found as a fact, that during 1947 and 1948 the production of coal was secondary to the primary objective of constructing or setting up the facilities for the subsequent mining and removing of the main body of the coal, namely, the driving of entryways and the accompanying airways. During those years petitioner had turned its available manpower and machinery to the driving of the entryways, in order to attain or achieve a position from which its room mining of coal could be resumed. It follows, we think, that the expenditures incurred in driving and completing the entryways were made for attaining an output of coal from the main body of ore, and not for the purpose of maintaining an output which had already been attained. Guanacevi Mining Co. v. Commissioner, supra. See also Connellsville Central Coke Co., 27 B. T. A. 771. The work done in 1947 and 1948 was that of developing additional ores for mining, both in fact and within the meaning of the regulations, and the respondent did not err in his determination that the expenditures in those years which were in excess of net receipts from the coal sold should be charged to petitioner’s capital account and be recoverable through depletion. Decision will be entered under Bule 50. Sec. 29.23 (m)-15. Allowable Capital Additions in Case op Mines. — (a) All expenditures In excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine wiU be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining. (b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expense.