**CLEAR FORK COAL COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

**No. 12487.**

United States Court of Appeals
Sixth Circuit.

Feb. 6, 1956.

Rucker Todd, Louisville, Ky., Chas. I. Dawson, Bullitt, Dawson & Tarrant, Louisville, Ky., on brief, for petitioner.

Meyer Rothwacks, Washington, D. C., H. Brian Holland, Ellis N. Slack, Hilbert P. Zarky, Washington, D. C., on brief, for respondent.

Before MARTIN, MILLER and STEWART, Circuit Judges.

MARTIN, Circuit Judge.

The taxpayer, Clear Fork Coal Company, has filed its petition for the review of a decision of the Tax Court of the United States holding that there are deficiencies in the company's income tax for the year 1947 in the amount of $1,-365.87 and for the year 1948 in the amount of $32,802.40.

The basis of the tax court's decision was that, during the years in question, the petitioner's mine, No. 4, was in a "development stage" and not in a "producing status" within the meaning of section 29.23(m)–15 of Regulations 111 of the Internal Revenue Bureau. This regulation provides: "(a) All expenditures in excess of net receipts from minerals sold shall be charged to capital

account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining."

The tax court held that the driving by the petitioner of entryways in 1947 and 1948 was for the development of additional ore for mining; that, in consequence, its mine (No. 4) during those two years was in the development stage within the meaning of the section of the regulation just quoted; and that, accordingly, the Commissioner of Internal Revenue did not err in determining that expenditures made by the taxpayer in those years, in excess of net receipts from coal sold, should be charged to Clear Fork Coal Company's capital account and be recoverable through depletion. The petitioner has contended throughout, and now contends, that during 1947 and 1948 its mine, No. 4, continued to be in the production stage and was erroneously held to be in a development status.

As found by the tax court, the petitioning Kentucky corporation, beginning in the year 1905, opened five mines located in Logan Mountain in the Cumberland Range. Its No. 4 mine was opened in 1944 in the so-called Jellico Seam, located within a thirty to forty square mile area in Southeastern Kentucky and Northeastern Tennessee. Other mining companies had mined in the Jellico Seam; and the operators of petitioner were aware of the nature and quality of its coal, its thickness and ceiling conditions.

Some two years prior to the opening of its No. 4 mine in 1944, petitioner bored holes and made geological surveys to determine the condition of the Jellico Seam in the immediate area. It was thus determined that the seam varied in thickness from thirty-two to thirty-eight inches. Above the seam was a layer of soft shale twenty-four to forty inches thick and over that a six-inch rider seam of coal and then a layer of sandstone. With this information at hand, the petitioner made plans for developing and working this mine by the "room and pillar" method. In this method of mining coal, headings or entryways are driven into the seam so as to expose the main body of coal, and rooms are then turned off at right angles to the entryways.

In its findings of fact, the tax court engaged in detailed statement, which is summarized in a footnote.[1]

1. It was found that the entryways in the mine in question were thirteeen or fourteen feet wide and were driven through the main seam of coal. The shale and the rider seam, in addition to the layer of coal, were removed so that there would be a sandstone ceiling overhead which weathered better, was more easily contained, and was safer than shale. Moreover, additional headroom and working space were provided.

In the entryways, tracks for coal cars and electric power lines were needed for the operation of the machinery and the removal of coal from the mine. Airways driven some twenty feet to the side and parallel to the entryways were thirteen or fourteen feet wide, and provided the essential ventilation for the mine. Usually there was an airway on each side of an entryway. In the driving of the airways, only the main seam of coal was removed. Thus, they were only thirty-two to thirty-eight inches high, with soft shale ceiling which occasioned frequent falls. The airways were not heavily timbered for support. When small ceiling falls occurred, material was not moved; and when larger ceiling falls happened, the material was merely spread out so that the airways were kept sufficiently clear to obtain free circulation of air.

The rooms were turned off at right angles to the entryways and airways. Each room was about twelve feet wide at the neck where it turned off the entryway, and then funneled out and increased in width to twenty-five or twenty-seven feet. Each was about 250 to 300 feet deep; and, as in the case of the airways, only the main seam of coal was removed from the rooms.

In our judgment, the finding of the tax court was clearly erroneous to the effect that the cost of driving the entryways and accompanying airways, includ-

Due to the nature of the shale overlay above the coal, rooms could not be turned from an entryway at a given point as long as the entryway was needed to reach the coal and remove it from beyond that point. The turning of rooms and the mining of coal would have resulted in cave-ins rendering the entryways of no further use; and, in consequence of this, it was necessary to mine coal in Mine No. 4 by the "retreat method," by which the entryway was driven as far as desired before any rooms were opened from it. The first rooms would be opened and mined; and, as the operation retreated toward the mouth of the entryway, new rooms would be opened and mined.

In 1944, a portal to the No. 4 mine was opened and an entryway driven from it in a southeasterly direction for about 800 feet. The point reached was designated as 1–South, from which a second entryway, 1–West, was driven at a right angle. During 1945 and 1946, entryway 1–West and an accompanying airway were extended for a short distance, the plan being to continue with entryway 1–South. and, at 600 feet intervals, to drive cross-entryways parallel to 1–West and at right angles to 1–South for the purpose of mining coal from rooms turned from the cross-entryways. The first such cross-entryway was designated 1–Left, and the others 2–Left, 3–Left, and so on in sequence.

In 1945, the driving of cross-entryway 1–Left was begun; rooms were turned near its mouth and coal mined therefrom. The conditions around the coal seam were found to be such that the rooms could not be turned and the coal mined as the driving of the entryway progressed. Mining was accomplished only by the retreat method. During the greater part of 1945 the operations of petitioner consisted in driving entryway 1–South and its accompanying airways a short distance beyond the point at which cross-entryway 1–Left would be turned, and in driving I–Left and its accompanying airways toward the point in the main body of the coal at which the turning of rooms was to begin.

Except for a slight amount of work done on 1–West, a limited extension of 1–South, and the completion of 1–Left to the depth of 1000 feet, the year 1946 was consumed in the turning of rooms and the retreat mining and removing of coal along 1–Left. At the end of that year, the mining of the rooms was com-pleted back to and including the experimental rooms which had been turned near the mouth of the entryway in 1945.

Early in 1947, when entryway 1–South had reached the point at which cross-entryway 2–Left was to be turned, difficulties were encountered: faults were found to exist in the seam which made it impracticable to proceed further; the bed of coal slanted to such extent that the shaker conveyor in use would not shake the coal up the grade; excessive water was encountered; and roof conditions were found to be unusually bad. In view of these adverse conditions, the officials of the company decided to proceed no farther with the original plan of going forward with entryway 1–South. The petitioner thereupon removed its machinery to entryway 1–West and commenced extending 1–West with an accompanying airway. When some 300 feet from 1–South, it drove an entryway and an accompanying airway to the outcrop, at which point a fan was installed to provide more ventilation for the mine.

By the end of 1947, the entryway 1–West had been extended some 2200 feet from its intersection with 1–South; and, at 2000 feet, an entryway with accompanying airways, designated 2–South and running parallel with 1–South, had been turned at a right angle from 1–West. All during 1947, the petitioner was occupied entirely with the driving of entryways as described; it did no room mining; and it mined and removed only such coal as was in the path of the entryways and airways being driven chiefly along 1–West, and from 1–West to the outcrop where the fan was placed.

During 1948, petitioner devoted its full time to the further driving of entryways and accompanying airways. 1–West was extended for a farther distance of approximately 1400 feet. 2–South was driven for a distance of 1200 feet to a point at which cross-entryway 2–Left was to be turned for "room mining" of coal. The petitioner drove cross-entryway 1–Left from 2–South in a northeasterly direction to the approximate point at which that entryway had been driven from 1–South in 1945 and 1946; and the room mining of coal had begun. Machinery from another mine was set up in 1–South in an added effort to extend that entryway.

Petitioner succeeded in turning and driving entryway 2–Left for about 200 feet; and, in 1949, that entryway was extended some 300 feet farther, and util-

ing the mining and removing of coal therefrom, was substantially greater than that of the mining and removing of comparable quantities of coal from rooms. John L. Sheppherd, a mining engineer of 31 years experience, and Roscoe J. Langford, also of wide experience in the field of mining, both testified that the cost of producing coal from headings or airways and the cost of producing coal from rooms was approximately the same in the mine in controversy. Their reasonable explanation was that, although mining in the headings and airways requires removal of the top up to the sandstone, the expense of that operation was more than compensated from the fact that the airways did not have to be kept clear of roof fall. They said further that, in mining rooms, the process of backing machinery out of the rooms is expensive; and that it was more expensive to bring mining supplies to the working places in the rooms than to bring up supplies in mining in headings and airways.

It is true that the government's only witness, Edward J. Mahan, who had never actually worked for a coal company in any capacity, testified that it was more expensive to mine headings and airways than to mine rooms. The reason for his opinion was not logical. Seemingly, it rested upon the thought that mining costs were necessarily greater in the headings and airways, inasmuch as the petitioner was losing money in such work. His error in relying upon such reasoning seemed to stem from the erroneous premise that Clear Fork made a profit in room mining, when, as a matter of fact, it did not. It lost money every year Mine No. 4 was operated, and finally suspended operations in 1951 because the mine was a losing proposition. The figures in evidence show that, in 1948, when petitioner did no room min-

ing at all, it cost slightly less to produce a ton of coal from Mine No. 4 than it did in 1949 when the bulk of petitioner's mining consisted of room mining.

The United States Tax Court considered that the driving of entryways 1-West and 2-South, and their maintenance for entry to and removal of coal lying to the southwest of 1-South, became a necessity and those entryways had to be driven and established before petitioner's projected plan for room mining of the main body of coal could be accomplished. The tax court said further that the entryways were the only means for opening up, for the mining of coal along cross-entryways 1-Left, 2-Left, 3-Left, 4-Left and other cross-entryways, which might be driven from 2-South or from any extension thereof. The court said that "they were part and parcel of the facilities constructed or developed for the subsequent mining of such coal, and being main entryways, they could not be utilized for the room mining of the coal adjacent to them until the areas beyond had been worked." The tax court reasoned: "To do otherwise, would have resulted in cave-ins and the closing not only of these main entryways but the mine beyond. In the driving of these entryways, the production of the coal removed was of secondary importance. The primary objective was the construction or setting up of the facilities for the subsequent mining and removing of the main body of the coal by the room and pillar and the retreat methods of mining." It was pointed out that, in 1949 and 1950, except for the extension of 2-South and the driving of cross-entryways for various distances, the petitioner's entire activity was that of room mining along cross-entryways; and that, in 1951, Mine No. 4 was closed as an unprofitable operation.

ized for the room mining of coal. It was not possible to overcome the difficulties encountered in the effort to extend entryway 1–South, with the result that in 1948 plans for any farther extension of 1–South were abandoned. Neither in

1947 nor in 1948 did petitioner engage in the room mining of coal. The only coal mined and removed in those years was that which was in the entryways and airways driven, as described by the tax court.

In connection with the reasoning of the tax court, it should be observed that during 1947 petitioner produced more than 23,000 tons of coal from Mine No. 4, which was nearly 5,000 tons more than it had produced from that mine in 1946 when it was mining rooms by the retreat method. During 1948, petitioner produced from the mine in question 40,-380.61 tons of coal, which was more than double the tonnage produced in 1946. The coal produced from Mine No. 4 during 1947 and 1948 was sold for more than $290,000. In 1949, while engaged in room mining, the petitioner produced only 39,473.98 tons of coal, which was slightly less than it had produced in 1948 while mining only headings and airways. True, production was stepped up in 1950 to more than 60,000 tons; but this does not nullify the argument of petitioner that its operations in 1947 and 1948 were for production purposes and not for the primary object of the future development of the mine.

Petitioner reported losses on Mine No. 4 in the amount of $91,013.99 for 1947 and $54,750.87 for 1948. Respondent disallowed the deduction of these losses and determined that the mine was in the development state during those years, and that the expenditures in excess of net receipts were to be capitalized under section 29.23(m)–15 of Regulations 111, and recoverable through depletion. The tax court upheld the determination of the Commissioner. The conclusion was drawn that the expenditures incurred in driving and completing the entryways were made for attaining an output of coal from the main body of ore, and not for the purpose of maintaining an output which had already been attained; and that the work done by petitioner in 1947 and 1948 was that of developing additional ores for mining, both in fact and within the meaning of the regulations.

The legal conclusion of the tax court appears to have been based upon two authorities: Guanacevi Mining Co. v. Commissioner of Internal Revenue, 9 Cir., 127 F.2d 49; and Alsted Coal Co. v. Yoke, 4 Cir., 200 F.2d 766. Citing these two cases in construing the pertinent regulation, the tax court said: "While the term 'development' has not been given a precise definition under the regulations or in the cases decided, and may not be susceptible of such a definition, it has been held that its use 'is not restricted to "discovery" or "exploration," ' and further, that a mine, though previously and for an extended period in a production status, may again be in the development stage within the meaning of the regulation, even though the new development was not that of other or newly discovered bodies of ore but of ore bodies which previously had been worked."

In our judgment, the reliance of the tax court for its conclusion upon the two cases cited is not well placed. In the Guanacevi Mining Co. case, supra, there had been no production at all in the years involved in digging tunnels to reopen an abandoned mine. The court of appeals naturally held that the mining company, by driving tunnels made available for working ores, normal output of which had ceased, could not deduct expenditures on tunnels from gross income as "operating expenses," inasmuch as such expenditures were made to attain and not to maintain an output and, hence, constituted "development expenses" chargeable to capital to be recovered through depletion deductions. The court stated that it was certain that the use of the term "development" is not to be restricted to "discovery" or "exploration"; and said: "The teaching of the opinions in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83, 85, 86, and Enterprise Coal Co. v. Phillips, D.C.Pa., 12 F.Supp. 49, 50, 51, affirmed, 3 Cir., 84 F.2d 565, impress upon us that if an expenditure is made to *attain* an intended output, it is properly chargeable to capital as a cost of development; if the expenditure is made to *maintain* an output, it is properly chargeable to operating expense." 127 F.2d 51.

The facts of the Alsted Coal Co. case, supra, are even more divergent from those in the case at bar, for the mine in-

volved there had been abandoned seventeen years and all except pillar coal had been removed from it. During the seventeen years that the mine had been lying dormant, water had drained into it, timbers supporting the roof had rotted, and much debris had accumulated in the headings and in the rooms as a result of roof falls. Beginning in the first month of 1945 and continuing until June 15 of that year, expenditures of more than $33,000 were made in pumping water, clearing debris, retimbering, constructing a tipple, changing an old manway into a haulway, laying rails and pipes, stringing wires, and generally doing what was necessary to reach the pillar coal and make possible its removal from the mine. Until June 15, little or no coal was removed from the mine; but, after that date, large quantities of coal were removed for the remainder of the tax year. It was held that, under these circumstances, the expenditures made prior to June 15 had been properly charged to capital account and not treated as ordinary and necessary expenses of the business.

In the opinion in the Alsted case [200 F.2d 769], Chief Judge Parker quoted the rule laid down by R. V. Norris, Chairman of the Coal Sub-Committee of the American Institute of Mining and Metallurgical Engineers, which rule the court had previously quoted with approval in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83, 86, as follows: " 'Development. The cost of the development of a property to its intended output is properly chargeable to capital. All further development to maintain output is properly operating expense. A mine may be considered developed when there are sufficient working places to produce the designed output, and sufficient entry work in progress to replace exhausted areas and maintain output. Sufficient advance development should be maintained to assure beyond question the maintenance of output under unfavorable conditions.' " The Norris definition was also quoted with approval in Enter-

prise Coal Co. v. Phillips, D.C.M.D.Pa., 12 F.Supp. 49.

In line with the concept of the cases cited, the development of a mine may be said to consist of creating enough working places for the use of all the available machinery of the mine, enough to produce the designed output, or enough to attain an annual capacity to produce as against the maintenance of such capacity. Applying this concept, it is obvious that in 1947 and 1948 petitioner's Mine No. 4 was in the production stage, with enough working places for the use of all its machinery, and was maintaining its production. There were five working places in the mine throughout 1946, 1947 and 1948. Therefore, the mine never reentered the development stage. The testimony of Sheppherd was uncontradicted that coal could be mined as quickly from a working place in a heading or airway as from that in a room. The tonnage production during 1947 and 1948 has already been shown to have been sufficient to meet the maintenance test. It should be emphasized again that in the Guanacevi Mining Co. and the Alsted Coal Co. cases there was absolutely *no production* in the years involved in digging the tunnels in the first mentioned case, and in clearing the abandoned mine for operation in the last mentioned case. The expert witness, Sheppherd, explained that the development stage consists in the process of putting in timbers, opening up portals, and getting ready to produce coal at as many working places as are needed to use available equipment. The expert witness, Batten, a mining engineer of some thirty-two years experience, explained that whether a mine is in development or in production status depends upon the number of working places from which production may be obtained. We find no evidence in the record intimating a contrary understanding among practical miners and mining engineers.

Upon the entire record in the case, we think the finding of the tax court that Mine No. 4—during the tax-

able years involved—was in a development and not a production status was clearly erroneous. Wright-Bernet, Inc., v. Commissioner of Internal Revenue, 6 Cir., 172 F.2d 343, 345, 346. In our opinion, the tax court, for the reasons which have been heretofore stated, misconstrued and misapplied the applicable Treasury Regulations 111, section 29.23 (m)–15.

The decision of the tax court is, therefore, reversed; and the cause is remanded for further proceedings in conformity with this opinion.