SANTA FE PACIFIC RAILROAD COMPANY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 15828.

United States Court of Appeals Seventh Circuit.

May 17, 1967.

Robert R. Bateson, William P. Tilton, Jr., Chicago, Ill., for plaintiff-appellant.

Thomas L. Stapleton, Mitchell Rogovin, Dept. of Justice, Washington, D. C., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before CASTLE, SWYGERT, and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

Santa Fe Pacific Railroad Company, a subsidiary of the Atchison, Topeka and Santa Fe Railway Company, appeals from a judgment of the district court denying in part a claim for a refund of federal income taxes for the year 1951.[1] The questions presented concern the interpretation of sections 23(cc) and (ff) of the Internal Revenue Code of 1939.[2]

The taxpayer owned the mineral rights on certain lands in McKinley County, New Mexico upon which uranium-bearing ores were discovered in 1950.[3] Preliminary investigation proved encouraging and in December 1950 the taxpayer embarked upon a detailed program of investigation on the first of the five sections of land involved in this appeal. Similar programs were adopted for the remaining sections at various times in 1951. Perhaps because these operations concerned the first significant discoveries of uranium occurrences in limestone, the procedures employed were painstaking. It is not necessary to relate each of the specific activities engaged in by the taxpayer. In general, the programs consisted of several techniques for determining the nature, quality, and extent of the uranium occurrences previously discovered, including the establishment of grid systems staked out at 100-foot intervals, extensive sampling by means of core drilling, center pitting, and blasting, and assaying the samples taken.[4] The district court found, and there is substantial evidence in the record to support the ultimate finding, that all the operations undertaken by the taxpayer during the period in question were in the nature of "exploration" activities as that term is commonly understood in the mining industry. The taxpayer does not challenge this determination.

In its refund suit for overpayment of income taxes, the taxpayer alleged that in its 1951 federal income tax return it was entitled, but had failed, to deduct as "exploration" expenses under section 23 (ff) of the Internal Revenue Code of 1939 a certain portion of the expenses incurred in its investigation of uranium occurrences during 1951. The taxpayer also alleged that it was entitled, but had failed, to deduct its remaining expenses during 1951 as "development" expenses under section 23(cc) of the Code. The district court held that all the expenses in question were exploration expenses and that consequently the taxpayer's deduction was limited as provided by section 23(ff).

1. The taxpayer also sought refunds attributable to the years 1952 and 1953. The taxpayer's claims for those years were settled by agreement between the parties, and the portion of the judgment reflecting the settlement is not in issue.

2. Int.Rev.Code of 1939, ch. 1, §§ 23(cc), (ff), as added by the Revenue Act of 1951, §§ 309(a), 342(a), 65 Stat. 486, 515-516.

3. The first discovery of uranium-bearing ores, occurring in a limestone outcropping, was made on section 19, township 13 north, range 10 west in the spring of 1950. Subsequent investigation by the taxpayer's chief mining engineer prior to the end of 1950 disclosed mineralized outcroppings on four other fractional sections on which the taxpayer owned the mineral rights. These sections, all in McKinley County, New Mexico, were: (1) section 13, township 13 north, range 11 west; (2) section 23, township 13 north, range 10 west; (3) section 25, township 13 north, range 10 west; (4) section 31, township 13 north, range 9 west. Uranium mineralization occurring in sandstone was discovered on section 19 in January 1951.

4. The program adopted for the investigation of the uranium mineralization occurring in sandstone on section 19 consisted mainly of trenching operations.

The pertinent language of section 23 is as follows:

> In computing net income there shall be allowed as deductions:
>
> (cc) Development of mines
>
> (1) * * * all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit * * * if paid or incurred after December 31, 1950, and after the existence of ores or minerals in commercially marketable quantities has been disclosed.
>
>   *   *   *   *   *   *
>
> (ff) Deduction of exploration expenditures
>
> (1) * * * In the case of expenditures paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral, and paid or incurred prior to the beginning of the development stage of the mine or deposit, so much of such expenditures as does not exceed $75,000.

The taxpayer's principal contention is that in order to qualify as a development expense under section 23(cc), it is only necessary that an expenditure be incurred "after the existence of ores or minerals in commercially marketable quantities has been disclosed." The taxpayer argues that once a commercially marketable quantity of a mineral is shown to exist, all expenses subsequently incurred in connection with it are automatically deductible as development expenses. The taxpayer contends that the district court erred by considering evidence, in the form of expert testimony, as to the meaning of the word "development" in the mining industry. It says that by doing so the district court imposed a "double standard" not contemplated by the statute, that is, to qualify an expenditure as a development expense the court required

(1) that the expenditure have been made for the purpose of "development" as that term is understood in the mining industry, and (2) that the expenditure have been incurred after commercially marketable quantities of ore had been disclosed. In computing the deduction to which it claims to be entitled, the taxpayer assigned a date to each of the sections and partial sections of land on which it owned the mineral rights in order to identify the time at which the taxpayer had sufficient knowledge to determine that commercially marketable quantities of uranium-bearing ores existed. The taxpayer then claimed all its expenses in connection with the ore deposits on the respective properties after the "cut-off" dates as development expenses. The district court, in addition to finding that all the expenditures claimed were exploration expenses, found that the "cut-off" dates chosen by the taxpayer were incorrect and held that the taxpayer had failed to prove that any of its expenditures were made after the existence of commercially marketable quantities of ores had been disclosed.[5]

■■ We think the interpretation of section 23(cc) by the district court is correct. The statute, by its terms, pronounces the very double standard which the taxpayer contends is repugnant to a reading of it. The first requirement of the statute is that the expenditure must be incurred "for the development of a mine or other natural deposit." That such an expenditure must be incurred after commercially marketable quantities of ore have been disclosed is then expressly stated as an additional requirement. The statute does not, as the taxpayer would have it, define development expenses in terms of expenditures occurring subsequent to the discovery of a commercially exploitable deposit; in fact, the statute does not purport to define "development" at all. Under such circumstances it is proper, even necessary, to attribute the same meaning to

5. The district court also rejected a contention by the taxpayer that each of the fractional sections on which the taxpayer owned the mineral rights constituted a separate "mine or other natural deposit" within the meaning of section 23(cc).

the term as is generally ascribed to it by those whose activities the statute was designed to cover.

■ As the district court found, the development of a mine or deposit is commonly understood by authorities in the mining field to mean the activity necessary to make a deposit accessible for mining. Cf. Kennecott Copper Corp. v. United States, 347 F.2d 275, 281, 301–302 (Ct.Cl.1965). The techniques employed in development—stripping the overburden and constructing means for its removal (in the case of open pit mining), or sinking shafts and installing raises, tracks, pumps, et cetera (in the case of underground mining)—are all designed to prepare the deposit for extraction or exploitation. The development of a mine or deposit is to be distinguished from exploration, which the mining industry generally defines as the activity undertaken to ascertain the existence, location, extent, or quality of a mineral deposit. The techniques employed in exploration—drilling, trenching, pitting, sampling, assaying, et cetera— are calculated to achieve these objectives. As has already been stated, the operations engaged in by the taxpayer were exploration activities, and not development operations, within the general definitions employed in the mining industry. The taxpayer's expenditures were therefore not deductible under section 23(cc) as "expenditures paid or incurred * * * for the development of a mine or other natural deposit."

■ The language of section 23(ff) provides further clarification. That section allows the deduction, to the extent of $75,000, of expenditures incurred "for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral," if the expenditures are incurred prior to the commencement of the "development stage" of the mine or deposit. Expenses of the kind incurred by the taxpayer, that is, exploration expenses, are governed exclusively by section 23(ff) and are only deductible insofar as they satisfy the requirements of that section. They may not be converted into expenses for the development of a mine by the mere fact that they are paid or incurred after the disclosure of a commercially exploitable deposit.

The taxpayer attempts to gain support for its interpretation of section 23(cc) by quoting from the legislative history of that provision and from regulations issued under sections 615 and 616 of the Internal Revenue Code of 1954, the provisions of which are identical to sections 23(cc) and (ff) of the 1939 Code in all material respects. We perceive nothing in the committee reports[6] accompanying the proposals which were subsequently enacted as sections 23(cc) and (ff) to indicate that the deductibility of development expenses was to be determined solely by reference to the time of their occurrence. To the extent that the committee reports are illuminating, they indicate that the nature of the expenditure is critical to a determination of what constitutes a development expense and that the meaning to be ascribed to the word "development" is essentially the same as its common meaning in the mining industry.[7]

6. S.Rep. No. 781, 82d Cong., 1st Sess. (1951); H.R.Rep. No. 586, 82d Cong., 1st Sess. (1951); U.S.Code Congressional and Administrative Service 1951, pp. 1781, 1969.

7. The report of the Senate Finance Committee gives some indication of what expenditures were considered to be expenditures for development. In discussing the previous necessity of capitalizing all expenditures incurred prior to the production stage of a mine, the report states: "Included in the expenditures which must be so capitalized are the costs of shafts, tunnels, galleries, etc., which are necessary to make the ore or other mineral accessible." Referring to such expenditures, the report continues: "It is believed that the expenditures for the development of a mine—those incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed—are essentially similar to those incurred after the production stage has been reached, and,

The taxpayer nevertheless argues that under the district court's interpretation expenditures "for the purpose of ascertaining the existence, location, extent, or quality" of a mineral deposit are not deductible at all if they are paid or incurred after the development stage of that deposit has been reached. The taxpayer says that Congress did not intend to create such a class of nondeductible exploration expenses and that such expenditures must therefore be deductible as development expenses. The answer to this argument is that if Congress had intended to permit the deduction of all exploration expenses, it would have so provided. Congress, in sections 23(cc) and (ff), recognized two types of expenditures and placed limitations upon the deductibility of both. Development expenditures were declared to be deductible if they were paid or incurred "for the development of a mine or other natural deposit" and if they were paid or incurred "after the existence of ores or minerals in commercially marketable quantities has been disclosed." Exploration expenses were declared to be deductible, to the extent of $75,000, if they were paid or incurred in "ascertaining the existence, location, extent, or quality" of a mineral deposit and if they were paid or incurred "prior to the beginning of the development stage of the mine or deposit." The expenses incurred by the taxpayer were exploration expenses and the district court limited their deduction in the manner prescribed by section 23(ff).

■■■ The regulations cited by the taxpayer,[8] because they were not issued under sections 23(cc) and (ff) of the 1939 Code, are not directly applicable to this case. In any event we do not find them repugnant to the district court's interpretation of the statutes. The taxpayer, rephrasing its earlier arguments, contends that because section 1.615–1 of the Treasury Regulations states that the development stage of a mine begins when "deposits of ore or other mineral are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation," all expenditures occurring after the development stage has been reached must, ipso facto, be development expenses. In the regulation quoted, however, the statement regarding the development stage serves only to identify the time after which exploration expenditures relating to a mine or deposit are no longer deductible, not to identify the time after which expenditures for exploration become deductible as expenditures for development. The taxpayer also emphasizes the language in section 1.616–1 of the Treasury Regulations which states that deductible development expenditures are "those" which are made after ore in commercially marketable quantities has been disclosed. We think the word "those," although possibly ambiguous, refers to the words "development expenditures," not solely to the word "expenditures," as the taxpayer implies. Thus the regulation merely rephrases the statutory language permitting the deduction of those expenditures "for the development of a mine" which occur after a commercially exploitable deposit has been disclosed. In short, neither regulation suggests that expenditures may be deducted as development expenditures if they are actually exploration expenditures or if they are not paid or incurred for "development," as that term is understood in the mining industry.

In view of our agreement with the district court that all the expenses incurred by the taxpayer were for the purpose of

---

like those, should be treated as expenses relating to the production of the ore or minerals. This is particularly important where the depletion allowance is a percentage of the gross income from the property. This allowance is the same whether a large expenditure or a relatively small one is necessary to develop the mine in order to enable the ore or mineral to be ex-

tracted, with the result that mines with relatively large development costs are subjected to unfair discrimination." S. Rep. No. 781, 82d Cong., 1st Sess. 43–44 (1951); U.S.Code Congressional and Administrative Service 1951, p. 2014.

8. Treas.Reg. §§ 1.615–1, 1.616–1 (1960), 26 C.F.R. §§ 1.615–1, 1.616–1 (1966).

exploration, and because the taxpayer received the maximum deduction allowed for exploration expenses, it is not necessary to discuss the taxpayer's remaining objections. Thus we need not consider whether the district court erred in rejecting the "cut-off" dates proposed by the taxpayer or in failing to determine the proper "cut-off" dates, or whether each section on which the taxpayer owned the mineral rights constituted a single "mine or other natural deposit" within the meaning of section 23(cc).

The judgment of the district court is affirmed.