### CUSHING STONE COMPANY, INC.

v.

### The UNITED STATES.

No. 419–70.

United States Court of Claims.

May 12, 1976.

C. J. Head, New York City, atty. of record, for plaintiff; Hays, Landsman & Head, New York City, of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

William D. Crampton, St. Louis, Mo., for the National Coal Ass'n, amicus curiae; Robert F. Stauffer, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This case, before the court on the parties' respective motions for summary judgment, requires us to determine whether certain expenditures incurred by a quarry operator for the removal and relocation of power transmission towers and lines located on a utility strip traversing the quarry property are "development" expenditures within the meaning of Section 616(a) of the Internal Revenue Code of 1954.

I

The material facts are stipulated. Since 1917, plaintiff, Cushing Stone Company, Inc., has operated an open pit dolomite limestone quarry in Montgomery County, New York, on lands which plaintiff either owned in fee (148 acres) or to which it possessed stone quarrying rights (20.46 acres). Prior to 1963, these lands were separated by a 300-foot-wide strip of land owned by Niagara Mohawk Power Corporation (Niagara Mohawk) and on which Niagara Mohawk had erected transmission towers and lines.[1] Although plaintiff had no stone quarrying rights in the utility strip, it did have the right to cross the strip by

---

1. The 20.46 acres on which plaintiff held stone quarrying rights also were owned by Niagara Mohawk. Of the 20.46 acres, 12.06 acres abutted the east side of the utility strip and 8.40 acres abutted the west side. Plaintiff had acquired quarrying rights in this acreage from Niagara Mohawk's predecessor, New York Power and Light Corporation, by deed dated March 11, 1930.

tunnel or other acceptable means in order to gain access to the remainder of its quarry lands.[2]

Plaintiff's quarrying activities initially were confined to an area west of Niagara Mohawk's utility strip. By 1962, however, plaintiff's operations had progressed to the point where the open face of its quarry abutted the western edge of the utility strip. According to plaintiff's estimates, the supply of quarriable stone in the lands to the west of the strip would be completely exhausted within 5 years. Since further development of the quarry to the north and south was economically or physically impossible, orderly mining could continue only if plaintiff gained access to its land to the east of the utility strip.

The necessary access clearly could have been gained by tunneling under the transmission lines or developing a new quarry face on the eastern side of the strip. However, since both alternatives were prohibitively expensive and would have rendered its operations uneconomical and uncompetitive, plaintiff concluded that Niagara Mohawk's transmission lines and towers would have to be removed and relocated on other lands.[3]

On September 19, 1962, after several years of negotiations, plaintiff and Niagara Mohawk entered into two separate agreements pursuant to which plaintiff agreed to exchange certain land for the utility strip and to bear the full cost of removing and relocating the transmission towers and lines. Plaintiff then purchased 22 acres of land from Edward W. Miller and 46.7 acres of land from Charles D. Persons, Jr., at an aggregate cost of $34,174. Although the principal purpose of these acquisitions was to obtain property to exchange for the utility strip, plaintiff recognized that certain portions of the Miller and Persons tracts would be retained by plaintiff and mined to the extent that they contained exploitable quantities of stone.[4]

On April 12, 1963, plaintiff conveyed to Niagara Mohawk a strip of approximately 23.67 acres of land, upon which the latter's transmission lines were to be relocated.[5] This acreage consisted of part of the tracts acquired from Miller and Persons, as well as land previously owned by plaintiff. Ten days later, Niagara Mohawk conveyed to plaintiff in fee approximately 31.45 acres of land, including virtually all of the utility strip and approximately 11.29 acres of land to which plaintiff already had stone quarrying rights.[6]

As a result of the exchange of land and the ultimate relocation of Niagara Mohawk's transmission towers and lines, plaintiff gained access by the most economical means to 11.08 million tons of accessible and quarriable stone.[7] Of this amount, 4.28

2. Plaintiff had acquired this right in 1930 when it purchased stone quarrying rights in the 20.46 acres of Niagara Mohawk land abutting the utility strip.

3. Plaintiff had begun planning for the eventual relocation of Niagara Mohawk's transmission facilities as early as October 1954, when the company's Board of Director's established a reserve fund of $250,000 "for the express purpose of providing funds from which to pay the necessary cost of moving and relocating high-tension lines and towers of the Niagara Mohawk Power Corporation which cross the property of this company at its Cranesville Quarry." At a meeting held November 9, 1960, this reserve was increased to $350,000.

4. In order to obtain the lands it needed to make the exchange with Niagara Mohawk, plaintiff had to acquire the Miller and Persons tracts in their entirety. Of the acreage eventually re-

tained by plaintiff, only the Persons tract contained accessible quantities of quarriable stone (approximately 4.86 million tons).

5. In addition to the 23.67 acres, plaintiff also relinquished its stone quarrying rights in approximately 5.29 acres of land already owned by Niagara Mohawk.

6. Of the 11.29 acres, 8.23 acres had been mined and virtually depleted of quarriable stone by the time plaintiff acquired the fee title. The remaining 3.06 acres were inaccessible for future quarrying operations.

7. All estimates of the tonnage of quarriable stone acquired and relinquished by plaintiff in connection with the relocation of the transmission towers and lines were made solely for purposes of this litigation. No estimates were made before, contemporaneous with or in anticipation of the acquisitions and exchanges at issue.

million tons are contained in lands which plaintiff previously owned or to which it had quarrying rights, but to which access had been effectively blocked by Niagara Mohawk's transmission towers and lines. The remaining 6.80 million tons represent the net gain to plaintiff from the exchange of lands with Niagara Mohawk (1.94 million tons)[8] and plaintiff's retention of a portion of the Persons tract (4.86 million tons).

Niagara Mohawk eventually expended $166,614 in physically removing and relocating the transmission towers and lines. Plaintiff was billed for this amount, which it paid on February 23, 1965. The costs of acquiring the Miller and Persons tracts (i.e., $34,174), which originally had been entered on a capital account, were then transferred to an expense account and treated as a part of plaintiff's overall cost of relocating the transmission towers and lines. The full $200,788 (i.e., the $166.614 and the $34,174) was deducted on plaintiff's 1965 tax return as a mine development expenditure.[9]

When the Internal Revenue Service (IRS) audited plaintiff's 1965 return, it disallowed the claimed deduction on the ground that the $200,788 was a nondeductible capital outlay within the meaning of section 263 of the Code. Plaintiff was then assessed an additional $42,725 in taxes and interest. After paying the IRS the full amount of the assessment, plaintiff filed a timely claim for refund, which was denied.[10] This action ensued.

Plaintiff originally claimed in its petition that both the $166,614, expended to remove and relocate the transmission towers and lines, and the $34,174, expended to acquire the Miller and Persons tracts, were fully deductible as mine development expenditures under section 616(a). At oral argument, however, plaintiff informed the court that it was willing to charge the entire $34,174, including any part thereof which might be deductible, to a capital account. As a result of this concession, we need only consider the deductibility of the $166,614.

## II

Section 616(a) provides a current deduction from taxable income for

all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed.[11]

---

**8.** The 31.45 acres acquired by plaintiff in the exchange are estimated to contain approximately 7.82 million tons of quarriable stone. Since the 23.67 acres conveyed by plaintiff to Niagara Mohawk only contain an estimated 5.88 million tons of quarriable stone, plaintiff's net gain is approximately 1.94 million tons of stone.

**9.** As a result of this deduction, plaintiff realized a net operating loss in 1965 of $68,402.

**10.** In addition to the refund claim for $42,725, plaintiff also filed a separate claim for refund in the amount of $30,143, with interest, based upon the carryback to 1962 of plaintiff's 1965 net operating loss. This claim, which was disallowed on the ground that plaintiff's 1965 net operating loss had been eliminated by the disallowance of the $200,788 deduction, is also at issue in this proceeding.

**11.** Int.Rev.Code of 1954, § 616(a). Section 616(a) is derived, with only minor clerical changes from section 23(cc) of the 1939 Code, which had been enacted in 1951 by section 309(a) of the Revenue Revision Act of 1951, ch.

521, § 309(a), 65 Stat. 486. Prior to 1951, virtually all expenditures incurred before a mine had reached the production stage, had to be charged to a capital account and recovered through the depletion allowance. Treas.Reg. 111, § 29.23(m)–15(a); *see* G.C.M. 13954, XIII–2 Cum.Bul. 66, 69 (1934). After the mine had reached the production stage, however, all ordinary development expenditures required to maintain normal production were deductible as operating costs in the year paid or incurred. *United States Gypsum Co. v. United States*, 206 F.Supp. 744, 749 (N.D.Ill.1962). Extraordinary or "capitalized" development expenditures, incurred during the production stage, were treated as deferred operating expenses deductible ratably as the ores or minerals benefited thereby were produced and sold. G.C.M. 13954, *supra*, at 72. *See generally* 4 J. Mertens, *The Law of Federal Income Taxation* § 24.54, at 326–27 (rev. ed. 1973); Alexander & Grant, *Mine Development and Exploration Expenditures*, 8 Tax L.Rev. 401, 403 (1953); Grossman & Johnson, *Distinction Between Exploration and Development Expenditures in the Hard Minerals Industry*, 27 Tax Lawyer 119, 120 (1973).

Since it is undisputed that plaintiff's $166,-614 expenditure was incurred after commercially marketable quantities of limestone had been disclosed, the only issue we must decide is whether that expenditure was "for the development of a mine or other natural deposit."

Neither section 616(a) nor the regulations promulgated thereunder articulate a standard for determining when an expenditure is for the development of a mine. The Senate Finance Committee, in its report accompanying the enactment of the predecessor to section 616(a), merely indicated that such expenditures *include* "the costs of shafts, tunnels, galleries, etc., *which are necessary to make the ore or other mineral accessible.*" S.Rep. No. 781, 82d Cong., 1st Sess. 43 (1951); U.S.Code Cong. & Admin. Service 1951, pp. 1969, 2014 (emphasis added). The IRS has adopted the view that an expenditure is not deductible as a development expenditure unless it was incurred as the direct result of some physical mining process or activity, such as removing overburden, stripping, laying pipe, sinking shafts, or tunneling, which is necessary to make the ore or minerals in place accessible for production operations.[12]

If plaintiff had exercised its right to tunnel under Niagara Mohawk's utility strip,[13] it is clear that plaintiff could have deducted its tunneling expenditures under section 616(a) without challenge from the IRS. Since tunneling, however, would have cost as much as $500,000, plaintiff chose to accomplish the same result, at considerably less expense, by removing and relocating Niagara Mohawk's transmission towers and lines. Defendant, however, contends that plaintiff lost the deduction that it otherwise would have been entitled to when it altered the manner in which it gained access, i. e., by removing and relocating the transmission towers and lines rather than by tunneling under them. We cannot agree. In our opinion, the Government's position is economically wasteful and would inject into

section 616(a) a rigidity that conflicts in spirit and substance with Congress' intent in providing for the deductibility of mine development expenditures.

Defendant's theory for denying plaintiff the deduction it seeks is that the $166,614 is not directly attributable to some physical activity, but is merely a part of the consideration that plaintiff paid for the utility strip. Even assuming the validity of defendant's characterization of plaintiff's expenditure, it is clear that our main holding in *Kennecott Copper Corp. v. United States,* 171 Ct.Cl. 580, 347 F.2d 275 (1965), disposes adversely of defendant's argument. Defendant, however, contends that *Kennecott* was wrongly decided and should not be followed.

The majority of defendant's attacks on *Kennecott* are arguments, bolstered by the same case support, that were fully considered and rejected in that decision. To the extent that defendant has added no new support to those arguments, they need not be reconsidered for purposes of this opinion. Defendant, however, has also advanced arguments based wholly or in part on cases decided after *Kennecott.* Defendant maintains that these cases compel us to overrule our holding in *Kennecott* that the costs of acquiring access to areas in which to conduct developmental activities, such as stripping, dumping, and leaching, are part of the development costs of a producing mine. While we conclude, in Part III of this opinion, that the basic holding of *Kennecott* is correct and disposes of defendant's contention that plaintiff's $166,614 expenditure is nondeductible, we think it is also clear that defendant's characterization of that expenditure as purely a land acquisition cost is inaccurate. The stipulated facts reveal quite the contrary—that the expenditure was incurred to remove and relocate a physical obstruction that prevented plaintiff from gaining access in the most economical means to quarry lands that it already owned. In Part IV of the opinion, we

---

12. Rev.Rul. 67–169, 1967–1 Cum.Bul. 159, 160; Rev.Rul. 67–35, 1967–1 Cum.Bul. 159; Rev.Rul. 66–170, 1966–1 Cum.Bul. 159, 160.

13. *See* note 2 *supra.*

discuss this aspect of the case and conclude, independent of *Kennecott*, that plaintiff's $166,614 expenditure is fully deductible and does not differ in any material way from other deductible developmental expenditures, such as tunneling, stripping, or the removal of overburden, that are "necessary to make the ore or other mineral accessible." *See* S.Rep. No. 781, 82d Cong., 1st Sess. 43 (1951); U.S.Code Cong. & Admin. Service 1951, p. 2014.

### III

In urging that *Kennecott* was wrongly decided and should not be followed,[14] defendant argues that the court erred (1) in relying upon Kennecott's primary purpose for making the contested expenditures, and (2) in rejecting the Government's argument that only expenditures directly related to some physical mining process or activity are deductible as mine development expenditures. We address these issues seriatim.

### A

The court in *Kennecott* relied on the taxpayer's primary purpose in determining whether the expenditures at issue were deductible (1) as "ordinary and necessary" expenses of mining,[15] and (2) as mine development costs under section 23(cc) of the 1939 Code.[16] In requesting that we reconsider our holding in *Kennecott*, defendant contends that reliance upon the taxpayer's primary purpose has been effectively foreclosed in "this type of situation" by the Supreme Court's opinion in *Woodward v.*

*Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970).[17]

In *Woodward*, the taxpayers, majority stockholders of an Iowa corporation, had voted in favor of a perpetual extension of the corporation's finite charter. Under Iowa law, the stockholders voting for the extension were required to "purchase at its real value the stock voted against such renewal." 397 U.S. at 573, 90 S.Ct. at 1304. After attempts to reach an agreement with the single dissenting shareholder on the "real value" of his minority interest had failed, the taxpayers brought an appraisal action in state court. That court determined the value of the dissenting shares and taxpayers purchased the minority interest at the price fixed by the court. Taxpayers then claimed as tax deductions various legal, accounting, and appraisal fees incurred in connection with the appraisal litigation, on the ground that they were "ordinary and necessary expenses paid * * * for the management, conservation, or maintenance of property held for the production of income." 397 U.S. at 574, 90 S.Ct. at 1304. The IRS, however, characterized the fees as capital expenditures "incurred in connection with the acquisition of capital stock of a corporation," and denied the deductions. *Id.*

In the ensuing litigation, the taxpayers argued that the proper standard for determining whether the expenditures were to be considered as incurred in the acquisition of a capital asset was the "primary" purpose test.[18] The Supreme Court, however,

14. *See* Rev.Rul. 67–35, 1967–1 Cum.Bul. 159 (Commissioner's nonacquiescence in *Kennecott*). *See also* Rev.Rul. 66–170, 1966–1 Cum.Bul. 159 (costs incurred by quarry operator to reimburse power company for the relocation of transmission facilities located on right-of-way through quarry property are additional capital expenditures for the acquisition of rights to the mineral property and are not development expenditures under section 616(a)).

15. *See* 171 Ct.Cl. at 629–31, 347 F.2d at 304–05.

16. *See id.* at 643, 347 F.2d at 312.

17. Plaintiff in the instant case does not seek to deduct its $166,614 expenditure as an "ordinary and necessary" expense of mining. As a

result, the court need only consider defendant's argument as it pertains to reliance upon the taxpayer's purpose in determining the deductibility of mine development expenditures under section 616(a).

18. The "primary" purpose test urged by the taxpayers had been developed in cases involving the deductibility of costs incurred in "defending or perfecting title to property." 397 U.S. at 576–77, 90 S.Ct. at 1305; *see* Treas.Reg. § 1.263(a)–2(c). The taxpayers' argument that the test should also be applied to costs incurred in appraisal litigation had been rejected by the Eighth Circuit in *Woodward*, 410 F.2d 313 (8th Cir.1969), but accepted by the Seventh Circuit in *Hilton Hotels Corp. v. United States*, 410

found that, while such a test was proper in other circumstances, the better test in cases involving the deductibility of appraisal litigation fees was one that involved "the simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself." 397 U.S. at 577, 90 S.Ct. at 1306. Applying that standard, the Court held that, since the origin of the appraisal litigation was the purchase, required by law, of the stock of the dissenting shareholder, "the expenses incurred in that litigation were properly treated as part of the cost of the stock that the taxpayers acquired." *Id.* at 579.

Defendant construes *Woodward* as precluding any and all reliance on the taxpayer's purpose in determining whether an expenditure is deductible as a mine development expenditure under section 616(a). Defendant concedes, however, that the *Woodward* case, involving the deductibility or capitalization of appraisal litigation expenses, is factually distinguishable from the instant case. We need only go one step further, and add that the case is so readily distinguishable that it has no pertinence to the issue before us.

■ The deductibility of the expenditures at issue in this case turns on the application of a special section of the Code providing a deduction from taxable income for all expenditures incurred *"for the development of a mine or other natural deposit."* Int.Rev.Code of 1954, § 616(a) (emphasis added). In making that determination, we consider it quite proper to attach some weight to the taxpayer's underlying purpose for making the contested expenditure (particularly where that purpose is unam-

biguous and fully supported by the evidentiary record).[19]

Defendant's suggestion that under *Kennecott* a miner might be able to deduct the cost of acquiring additional minerals greatly exaggerates our holding in that case. Although the taxpayer in *Kennecott* did acquire certain rights in disseminated copper ore, those rights were found to be incidental to the other, more important rights that were acquired. 171 Ct.Cl. at 591, 596–98, 610, 347 F.2d at 280–81, 284–85, 292. Despite the Government's arguments to the contrary, the court held, on the specific facts of the case, that the presence of an incidental nondeductible benefit in a bundle of deductible rights should not adversely affect the basic deductibility of the expenditures incurred. *Id.* at 598, 347 F.2d at 285. As the court put it

It is not the spirit of the law that the presence, wholly as an incident, of a nondeductible benefit among a bundle of rights acquired for a purpose which makes the bundle as a whole deductible, should infect all of the parts like a spoiled apple in the bottom of the barrel. Instead, the presence of such a benefit in a bundle of rights is a relative thing, and should be evaluated as such. It is concluded therefore, that if, in fact, plaintiff's purpose in making the substitute facilities expenditures was such as to render those expenditures deductible as mining expenses, the failure to allocate costs to the copper content of Tract A should not preclude recovery. [*Id.*]

That statement, however, in no way sanctions the deductibility of nonincidental mineral acquisitions. In an appropriate case,

F.2d 194 (7th Cir.1969), *rev'd*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970). The Supreme Court had granted certiorari to resolve that split. 397 U.S. at 574, 90 S.Ct. 1307.

**19.** *See Santa Fe R.R. Co. v. United States,* 254 F.Supp. 455, 460 (N.D.Ill.1965), *aff'd* 378 F.2d 72 (7th Cir.1967) (expenditure deductible as exploration expenditure because taxpayer's primary purpose in tunneling and trenching was to search for and locate ore); *Estate of DeBie v. Commissioner,* 56 T.C. 876, 893–94 (1971) (expenditure made for purpose of further delineating the location and extent of known com-

mercial ore body is development expenditure). *See generally* Grossman & Johnson, *supra* note 11 (determination of whether expenditure is deductible as development or exploration expenditure requires, an examination of the underlying purpose of the expenditure). *But see Geoghegan & Mathis, Inc. v. Commissioner,* 55 T.C. 672, 676 (1971), *aff'd,* 453 F.2d 1324 (6th Cir.), *cert. denied,* 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972) (criticizing this court's reliance in *Kennecott* on the taxpayer's primary purpose).

the court would be justified in allocating a portion of the expenditures for which a deduction is sought to any significant nondeductible benefit realized by the taxpayer. In *Kennecott,* the court concluded, solely on the basis of the facts before it, that an allocation was not required. In this case, were it not for plaintiff's concession at oral argument, we would treat some portion of the $34,174 that plaintiff expended for the Miller and Persons tracts as a capital expenditure.[20] However, plaintiff's concession makes an allocation unnecessary.

### B

In both the *Kennecott* case, and its non-acquiescence therein, the IRS took the position that only expenditures directly attributable to a physical mining activity, such as tunneling, stripping, or shaft-sinking, are deductible as mine development expenditures. That argument was rejected in *Kennecott,* the court finding that the costs of acquiring access through easements to areas in which to carry on developmental activities were a legitimate part of the development costs of a producing mine. *See* 171 Ct.Cl. at 634–35, 643, 347 F.2d at 307–08, 312. Subsequent to our decision in *Kennecott,* the Government successfully urged its theory upon the Tax Court and the Sixth Circuit in *Geoghegan & Mathis, Inc. v. Commissioner,* 55 T.C. 672 (1971), aff'd, 453 F.2d 1324 (6th Cir.), *cert. denied,* 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972).[21]

Encouraged by its success in that case, defendant has tried to persuade us to overrule *Kennecott* and to adopt the view that only costs directly attributable to a physical mining activity are deductible under section 616(a).

In support of its position, defendant relies on two cases, in addition to *Geoghegan & Mathis,* that were decided after *Kennecott. See Santa Fe R.R. Co. v. United States,* 378 F.2d 72 (7th Cir.1967); *Amherst Coal Co. v. United States,* 295 F.Supp. 421 (S.D.W.Va. 1969), *aff'd per curiam,* 27 P–H Am. Fed.Tax Rep. ¶ 71–358 (4th Cir.1971). We think that neither of these cases stands for the broad proposition urged by the defendant.

The taxpayer in *Santa Fe* had instituted a detailed investigative program designed to obtain information concerning the nature, quality, and extent of uranium-bearing ore in lands to which the taxpayer owned the mineral rights. Several investigatory techniques were employed, including the establishment of grid systems staked out at 100-foot intervals, extensive sampling by means of core drilling, center pitting, and blasting, and the assaying of the samples taken. The district court held that, since all of the techniques employed by the taxpayer were in the nature of "exploration" activities, any expenditures resulting therefrom were exploration expenditures deductible only in part under section 23(ff) of the 1939 Code. 378 F.2d at 74.

---

**20.** Plaintiff had acquired the Miller and Persons tracts for the purpose of obtaining land to exchange with Niagara Mohawk for the latter's utility strip. However, in order to acquire any of the land owned by Miller and Persons, plaintiff had to agree to acquire all of their property. The excess acreage which plaintiff acquired, and eventually retained, contains approximately 4.86 million tons of quarriable stone. Defendant urges us to make an allocation that would take into account this nondeductible benefit, and the fact that plaintiff realized a net gain of approximately 1.94 million tons of stone in the exchange of lands with Niagara Mohawk. Plaintiff's agreement, however, to treat the entire cost of the Miller and Persons tracts as a nondeductible capital expenditure makes it unnecessary for us to embark on such an undertaking.

**21.** The taxpayer in *Geoghegan & Mathis* had purchased a trace of land containing commercially marketable limestone. Traversing the central portion of the tract, on a right of way owned by a utility company, was a gas pipeline. In order to continue its mining operations, the taxpayer eventually had to obtain the release of the right of way in return for an alternative right of way and payment of the expenses of relocating the gas pipeline. The Tax Court and, on appeal, the Sixth Circuit held that the relocation expenditures were simply a part of the cost of acquiring a right of access to minerals, and therefore were to be treated as an additional investment in the taxpayer's mine and not as a mine development expenditure. *See* 453 F.2d at 1328, *aff'g* 55 T.C. at 676.

On appeal, the taxpayer conceded the validity of the determination that its expenditures resulted from "exploration" activities, contending only that *all* expenditures incurred after the discovery of commercially marketable quantities of ore are deductible as development expenditures under section 23(cc) of the 1939 Code (the predecessor to section 616(a) of the 1954 Code). *Id.* at 74–75. In rejecting the taxpayer's broad contention, the court, after noting that the term "development" is not defined by the Code, stated that it was proper

> to attribute the same meaning to the term as is generally ascribed to it by those whose activities the statute was designed to cover.

> As the district court found, the development of a mine or deposit is commonly understood by authorities in the mining field to mean the activity necessary to make a deposit accessible for mining. Cf. *Kennecott Copper Corp. v. United States,* 347 F.2d 275, 281, 301–302 (Ct.Cl.1965). [*Id.* at 75–76.]

In making the above statement, the court obviously was not attempting to comprehensively define the term "development" costs,[22] or to limit its application, in all cases, to costs incurred in the conduct of some physical activity. Defendant's contention that the court was attempting to do so is pure speculation.

Nor is it accurate to suggest that the decision in *Amherst Coal Co. v. United States, supra,* similarly stands for the proposition that *only* costs directly attributable to a physical mining activity are deductible as mine development costs. In *Amherst,* the taxpayer had incurred certain expenditures in constructing access roads to two mines. Despite the Government's contention that the costs of constructing the roads were not deductible as development costs under section 616(a), the court held that the

> roads were necessary to allow access to the mine openings. They were, in the words of the [*Santa Fe*] case, " * * * activity necessary to make a deposit accessible for mining." Accordingly, the expenses incurred in their construction were development expenses, within the meaning of the statute. [295 F.Supp. at 441.]

In our view, that statement does not aid defendant. On the contrary, we think it supports our holding herein.

Thus, the only direct support for defendant's "activity" requirement is the *Geoghegan & Mathis* decision. See 453 F.2d at 1328, *aff'g* 55 T.C. at 676. The Tax Court and Sixth Circuit opinions in that case, however, fail in our opinion to adequately distinguish between expenditures to acquire access rights at the time a mine is commencing production and similar expenditures incurred, for entirely different reasons, during the production stage of the mine. The *Manchester Coal Co.*[23] and *Denise Coal Co.*[24] decisions, cited by the Tax

---

22. *See Estate of DeBie v. Commissioner,* 56 T.C. 876, 893 (1971); Grossman & Johnson, *supra* note 11, at 124.

23. 24 B.T.A. 577 (1931). In *Manchester,* the taxpayer had acquired by lease the right to strip mine the coal underlying certain lands owned by other parties. Because the lessor feared that it would be liable to the owners of the surface for any damage to the surface resulting from the removal of the coal, the lease was made subject to the condition that the taxpayer acquire title to the surface before commencing production. The taxpayer did so and then began production. When the taxpayer claimed deductions for the "depletion" of the surface, they were disallowed by the IRS on the ground that any reduction of the value of the surface resulting from its destruction in the course of the stripping operations could be re-

alized as a loss when the land was ultimately sold. The Board of Tax Appeals, however, disagreed with the IRS, finding that the surface had been totally destroyed and, therefore, that

"[t]he land now has no market or salable value, and there is no reasonable prospect of its ever having such a value.

Under the facts here presented, where the land itself is destroyed or the coal is mined, we think that the cost of the land should be added to the cost of the coal in determining the depletion allowable." [24 B.T.A. at 582.]

24. 29 T.C. 528 (1957), *aff'd on this point,* 271 F.2d 930 (3d Cir. 1959). In *Denise,* the taxpayer had acquired various tracts of surface land overlying coal deposits which it owned or had the right to mine. For a period of 5 years, the taxpayer claimed deductions for the surface lands destroyed by stripping operations. When

Court as representing the "proper concept of the term 'development expenditures,'" 55 T.C. at 676, may have relevance in characterizing an expenditure undertaken when a mine is beginning production. As we indicated in *Kennecott,* however, they are of little value in deciding whether a similar expenditure, undertaken some 40 years after production had commenced, is "for the development of a mine" within the meaning of section 616(a). *See* 171 Ct.Cl. at 611, 347 F.2d at 293.[25]

In the absence of a clear indication from Congress that only expenditures relating to a physical mining "activity" are deductible as mine development expenditures, we do not accept the restrictive view taken by the Tax Court and Sixth Circuit in *Geoghegan & Mathis.* In our opinion, the term "development" expenditures is sufficiently flexible to cover the necessary costs of acquiring access, *during the producing stage* of a mine, to areas in which to conduct additional development activities. None of defendant's arguments to the contrary are persuasive.

## IV

In order to gain unfettered access to its lands to the east of the utility strip, plaintiff had to do two things. First, it had to acquire the utility strip itself and, secondly, it had to remove and relocate the transmission towers and lines located on the strip.

Plaintiff accomplished its first objective by entering into an agreement with Niagara Mohawk pursuant to which plaintiff agreed to exchange certain of its lands for the utility strip.[26] To accomplish its second objective, plaintiff entered into a separate agreement pursuant to which Niagara Mohawk consented to the removal and relocation of its transmission towers and lines in return for plaintiff's promise to pay the entire cost thereof.[27]

The mere fact, however, that the two agreements are component parts of a single plan does not mean, as defendant argues, that the agreements are so inextricably bound together that the costs incurred under the separate removal and relocation agreement are simply a part of the consideration that plaintiff paid for the utility strip. Our analysis of the stipulated facts and exhibits reveals quite the contrary—that the costs incurred under the agreement to remove and relocate the transmission towers and lines were *not* a part of the consideration that plaintiff paid for the utility strip. Plaintiff and Niagara Mohawk specifically state in the agreement providing for the exchange of lands that the

> parcels of land are of similar size and value and it is in the mutual best interests of both [parties] to exchange said lands *without any or other considerations passing from one party to the other.*

those deductions were denied by the IRS, the taxpayer filed suit in the Tax Court. Recognizing that "the fact situation was almost identical" to *Manchester Coal Co., supra,* the Tax Court held, on the basis of that case, that the taxpayer's expenditures to acquire the surface rights could be added to the depletion account, but could not be deducted as "ordinary and necessary" business expenses.

**25.** It is not enough to contend, as defendant does, that, in other circumstances, the expenditures by plaintiff would be nondeductible capital expenditures under section 263. Int.Rev. Code of 1954, § 263. While that section does deny deductions for expenditures "paid out for new buildings or for permanent improvements or betterments made to increase the value of any property," the section is specifically made inapplicable to "expenditures for the development of mines or deposits deductible under

section 616." *Id.,* § 263(a)(1)(A). The issue in this case is not, as defendant suggests, whether the costs of acquiring access to mineral-bearing lands are capital costs recoverable solely through the depletion allowances, but whether the particular expenditures at issue, under the facts of this case, are deductible as mine development expenditures under section 616(a).

**26.** The agreement was entered into on September 19, 1962. The actual exchange of land took place in April 1963.

**27.** This agreement was also entered into on September 19, 1962. Except for some preliminary work done in 1962, the removal and relocation was accomplished during 1963 and 1964. Plaintiff reimbursed Niagara Mohawk on February 23, 1965, for all costs incurred by the latter.

[Stipulation of Facts, Exhibit G, at 2 (emphasis added).]

■ Although defendant would apparently have us ignore this provision, we think it is persuasive evidence that the removal and relocation agreement is simply what it purports to be—an agreement pursuant to which plaintiff was able to remove a physical obstruction and gain access in the most economical manner possible to lands which it already owned or to which it possessed quarrying rights. In this respect, the expenditures incurred by plaintiff are substantially similar to costs incurred in tunneling, stripping, or removing overburden, i.e., costs which are "necessary to make the ore or other mineral accessible." S.Rep. No. 781, 82d Cong., 1st Sess. 43 (1951); U.S.Code Cong. & Admin.Service 1951, p. 2014.[28] Accordingly, the court finds, independent of *Kennecott,* that the costs incurred by plaintiff to remove and relocate Niagara Mohawk's transmission towers and lines are fully deductible as mine development expenditures under section 616(a).

## CONCLUSION

For the foregoing reasons, the court concludes, as a matter of law, that plaintiff is entitled to deduct the $166,614 that it expended to remove and relocate Niagara Mohawk's transmission towers and lines as a mine development expenditure under section 616(a). It is therefore ordered that plaintiff's motion for summary judgment is granted to that extent and defendant's cross-motion for summary judgment is denied. The court also concludes that the $34,174 which plaintiff paid for the land acquired from Miller and Persons was a capital cost and was not an expenditure which is deductible under section 616(a). With respect to the $34,174, plaintiff's motion for summary judgment is therefore denied and defendant's cross-motion is granted. The case is remanded to the trial judge to determine the amount of plaintiff's recovery in accordance with this opinion.

**28.** When plaintiff's expenditures are viewed as resulting from the physical removal and relocation of the transmission towers and lines, rather than as simply a part of the consideration that plaintiff paid for the utility strip, it is clear that defendant's physical "activity" requirement is satisfied. It is immaterial that the removal and relocation work was done by another party on plaintiff's behalf. *See* Treas. Reg. § 1.616–1(a).