### H. G. FENTON MATERIAL COMPANY, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7287–78. Filed June 23, 1980.

---

*Gene E. Smith,* for the petitioner.
*Rosa Berman,* for the respondent.

STERRETT, *Judge:* By letter dated May 26, 1978, respondent determined deficiencies in income taxes due from petitioner as follows:

| TYE Dec. 31— | Deficiency |
| --- | --- |
| 1974 | $33,379 |
| 1975 | 46,941 |
| 1976 | 37,539 |

After concessions, the only issues remaining for our decision are (1) whether certain costs petitioner incurred in obtaining special use permits are capital or currently deductible, and (2) whether amounts petitioner expended to remove sand from one minesite to a second minesite are capital or currently deductible.

## FINDINGS OF FACT

Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner H. G. Fenton Material Co. is a California corporation having its principal office in San Diego, Calif. Petitioner filed timely Federal income tax returns for its taxable years ended December 31, 1974, 1975, and 1976 on an accrual basis.

Petitioner has been engaged in the mining business since 1926. In conjunction with this business, petitioner has at all pertinent times owned the lands which are referred to herein as the Pala and Sloan Canyon projects located in San Diego County, Calif., and the mineral rights thereto. In connection with petitioner's mining operations at the Pala and Sloan Canyon projects, petitioner was required by the county of San Diego to obtain special use permits.

Special use permit No. P74–88 was issued by San Diego County with respect to petitioner's Pala project and has a 30-year life. Special use permit No. 74–68W was issued by San Diego County with respect to petitioner's Sloan Canyon project

and has a 15-year life. Both these permits authorize petitioner to operate barrow pits and sand processing plants on the respective projects. Both govern the manner of operation and construction of the pits and plants to the smallest detail. Without the permits, petitioner would not have been authorized to operate either project.

Petitioner incurred the following expenses in obtaining these permits:

| Taxable year | Pala project | Sloan Canyon project |
|---|---|---|
| 1974 | $16,468 | $43,547 |
| 1975 | 17,646 | 31,778 |
| 1976 | 5,938 | 22,450 |
| Total | 40,052 | 97,775 |

These expenses were incurred with respect to such items as filing fees, legal fees, engineering fees, environmental impact report preparation fees, grading plan preparation fees, and consulting fees.

Petitioner's mining operations produce excess materials and waste products, sometimes called Fenton's yellow fill, which must be disposed of in some manner or fashion so as not to interfere with petitioner's mining operations. In order to insure access to its mines and to prevent the waste from interfering with its mining operations, petitioner has disposed of such material in a variety of fashions over the years. During the taxable years in issue, petitioner disposed of such materials by hauling and depositing them upon other property owned by petitioner and referred to herein as the "Grantville Property" located in San Diego County, Calif.

In order to grade and fill the excess materials hauled to petitioner's Grantville property, as it was required to do, petitioner was required to obtain a grading permit. Petitioner obtained such a permit and an "engineering permit" which was, apparently, also required. In applying for the engineering permit, petitioner described the work it intended to do on the Grantville property as "land development." Thus, the permit required that petitioner create a building pad on the Grantville property. Petitioner agreed to such work because it felt that San Diego County would not have issued a permit only for dumping and filling.

Petitioner incurred the following expenses related to the aforestated waste removal operations for the years indicated:

| Taxable year | Expenses incurred |
|:---:|:---:|
| 1974 | $1,373 |
| 1975 | 33,379 |
| 1976 | 44,252 |
| Total | 79,004 |

These expenses were incurred with respect to permit filing fees, engineering fees, environmental impact report fees, grading plan fees, consulting fees, excess materials loading fees, hauling costs, grading, and compaction costs.

Petitioner's Grantville property was rendered incidentally more useable for industrial and/or commercial purposes, by virtue of the dumping and grading petitioner conducted on that property. Land adjacent to the Grantville plot was already developed as a light industrial park.

## OPINION

The first issue with which we must deal is petitioner's claim for a current deduction under either section 616 or section 162 for its expenses in obtaining the two special use permits. Respondent argues that these expenditures were capital outlays "related to the acquisition of an unlimited mineral mining right to use the land for purposes of extracting minerals." These capitalized costs, argues respondent, are recoverable only through cost or percentage depletion. Petitioner argues that these costs are "development expenditures" within the meaning of section 616, or "ordinary and necessary business expenses" deductible under section 162.

Section 616 provides that there shall be allowed as a current deduction in computing taxable income "all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit * * * if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed." Sec. 616(a). The parties have addressed the issue of whether these license fees are properly "development expenditures."

There are, in general, three periods in the life of a mine, viz, the exploration period, the development period, and the produc-

tion period. See, e.g., *Santa Fe Pacific Railroad Co. v. United States*, 378 F.2d 72, 76 (7th Cir. 1967); S. Rept. 781 (Part 2, supp.), 82d Cong., 1st Sess. (1951), 1951–2 C.B. 545, 559; sec. 1.617–1(a), Income Tax Regs. Exploration expenditures are those "paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit." Sec. 617(a)(1); sec. 1.617–1(a), Income Tax Regs. Development expenditures are those paid or incurred to render the deposits thus discovered accessible to commercial production. *Geoghegan & Mathis, Inc. v. Commissioner*, 55 T.C. 672, 676 (1971), affd. 453 F.2d 1324 (6th Cir. 1972); S. Rept. 781 (Part 2, supp.), *supra*, 1951–2 C.B. at 559. Production expenditures are those paid or incurred to sustain a level of production. Production consists of all those activities purely for extraction. Sec. 1.616–2(b), Income Tax Regs.; see G.C.M. 13954, XIII–2 C.B. 66, 73 (1934).[1] So long as production stage expenditures are not "extraordinary," i.e., "development" expenditures serving to increase substantially production or substantially reduce the cost of production, production period outlays are generally currently deductible, unless the election provided by section 616(b) is made. Sec. 616; sec. 1.616–2(a), Income Tax Regs.; S. Rept. 781 (Part 2, supp.), *supra*, 1951–2 C.B. at 559.

Prior to the enactment of the predecessor of section 616, i.e., section 23(cc), I.R.C. 1939,[2] no distinction between exploration and development expenses was made by the Code. Both types of expenditures were considered costs of development and were capitalizable except to the extent of net receipts from the mine during those periods. See, e.g., G.C.M. 13954, XIII–2 C.B. 66, 69–70. *Guanacevi Mining Co. v. Commissioner*, 127 F.2d 49, 51 (9th Cir. 1942), affg. 43 B.T.A. 517 (1941). The capitalized portion of such expenditures was added to the mine's depletion basis and recovered through depletion allowances. See, e.g., art. 221, Regs. 77, and see sec. 29.23(m)–15, Regs. 111. Development expenditures made in the production stage were deferred and deducted over the period the deposit benefited was mined. See. S. Rept. 781 (Part 2, supp.), *supra*, 1951–2 C.B. at 559.

---

[1] See D. Alexander & J. Grant, "Mine Development and Exploration Expenditures," 8 Tax L. Rev. 401 (1952–1953).

[2] Sec. 309(a), Revenue Act of 1951, 65 Stat. 486. See also sec. 23(ff), Revenue Act of 1951, sec. 342, 65 Stat. 515.

Section 616(a), thus, renders mine development expenditures currently deductible, as opposed to depletable. Section 616(a) specifically excludes from its coverage, however, "expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167," from the definition of development expenditures. Such expenditures have always been recoverable, either by depreciation or amortization, independent of whether or not development expenditures were deductible. Of course, the depreciation deduction amount, itself, may be a development expenditure. Sec. 616(a). This is not to say that expenditures for otherwise depreciable property cannot be currently deductible in full as ordinary operating expenses. Some expenditures for depreciable property, made during the production stage, for the sole purpose of maintaining production from existing working faces may be, for example, currently deductible. See *Marsh Fork Coal Co. v. Lucas,* 42 F.2d 83, 85 (4th Cir. 1930), revg. 11 B.T.A. 685 (1928); *Guanacevi Mining Co. v. Commissioner, supra* at 51. The expenditures before us are, however, clearly not production stage expenditures. They were made for the purpose of attaining production, not maintaining it. They are not, therefore, current operating expenses. See *Clear Fork Coal Co. v. Commissioner,* 229 F.2d 638, 643 (6th Cir. 1956).

By the same token, the expenditures before us are not "development expenditures" because they are amortizable. Sec. 1.167(a)–3, Income Tax Regs. By these expenditures, petitioner acquired intangibles of use in its trade or business for fixed periods of time, i.e., the right to operate its mines for the life of the permits. That this right was a substantial one is obvious from the fact that, had petitioner not been granted such right, no mining on its land would have been authorized and the pits might well have been worthless. A purchaser of either site with the intent of mining the site would presumably pay a higher price for the mines with a permit than it would for the mines without a permit.

This fact points out a second reason why petitioner must fail herein. We believe that this case is remarkably similar on both the facts and the law to our opinion in *Geoghegan & Mathis, Inc. v. Commissioner, supra,* and we believe the rule of that case requires that we reject petitioner's claims. There the taxpayer operated an open-pit mine. Petitioner's fee in the land was

subject to a pipeline right-of-way in a utility. As the face of the mine was pushed back and neared the right-of-way, the taxpayer was forced to acquire a release of the right-a-way. Applying arguments analogous to those presented to us by petitioner, the taxpayer sought to deduct its costs associated with the relocation of the utility's right-of-way as a development expenditure. We disallowed the claim saying:

> We think it clear that by its arrangement with the utility company petitioner eliminated a property interest in favor of the latter and acquired a *right* of access to the minerals which it did not previously have. Whatever may be the limits of the deductibility of expenditures for exploiting rights of access * * * either as development expenses under section 616 or as ordinary and necessary expenses under the so-called receding-face doctrine (see sec. 1.612–2, Income Tax Regs.), we think that payments for *rights of access* should not be included therein. * * * Such payments in reality represented an additional investment in petitioner's limestone deposit and, in our opinion, do not fall within the scope of "activity necessary to make a deposit accessible for mining." See *Santa Fe Pacific Railroad Co. v. United States*, 378 F.2d 72, 76 (C.A. 7 1967); *Amherst Coal Co. v. United States*, 295 F. Supp. at 441. The payment was for a *right* to engage in an activity, not an expense of carrying out the activity as such. [*Geoghegan & Mathis, Inc. v. Commissioner*, 55 T.C. at 675–676; fn. ref. omitted.]

Petitioner's investment in the permits was also a payment to acquire a "right of access" or a "right to engage in an activity." The right of the county to forbid use of the land is akin to the utility's easement over a portion of the land. For these reasons petitioner must fail.

We conclude that the expenditures related to obtaining the permits were capital. Sec. 263(a)(1). This conclusion also disposes of petitioner's section 162 claim. Sec. 261. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17–18 (1974).

Petitioner, of course, cites and relies upon the Court of Claims' opinions in *Kennecott Copper Corp. v. United States*, 171 Ct. Cl. 580, 347 F.2d 275 (1965), and *Cushing Stone Co. v. United States*, 210 Ct. Cl. 62, 535 F.2d 27 (1976). We considered and declined to follow the reasoning of *Kennecott Copper Corp. v. United States, supra (Kennecott)*, in our decision in *Geoghegan & Mathis, Inc. v. Commissioner*, 55 T.C. at 676. We there said that "[*Kennecott*] failed to distinguish between a payment for a right of access and a payment to exploit an unimpaired right of access which concededly exists." In *Cushing Stone Co. v. United States, supra,*

the Court of Claims reaffirmed its holding in *Kennecott*. Echoing our words in *Geoghegan*, the Court of Claims said:

The Tax Court and Sixth Circuit opinions in * * * [*Geoghegan*], however, fail in our opinion to adequately distinguish between expenditures to acquire access rights at the time a mine is commencing production and similar expenditures incurred, for entirely different reasons, during the production stage of the mine. [*Cushing Stone Co. v. United States, supra* at 35.]

Apparently, the Court of Claims would distinguish the treatment of payments on the basis of when during the life of a mine the expenditures occur. Acquisition of a right of access in the development stages would, apparently, be capitalizable while an identical expenditure in the production stage would be currently deductible. With all due respect, we believe that the Court of Claims' temporal dichotomy is unjustified. A "development expenditure" can occur during both the development and production stages. See, e.g., S. Rept. 781 (Part 2, supp.), *supra*, 1951–2 C.B. at 559. Prior to the enactment of section 23(cc), development expenditures, regardless of whether incurred in the development or production stages, were capitalizable (recoverable as a deferred expense if incurred during the production stage). With the enactment of section 23(cc), present section 616, these previously capitalizable development expenditures were rendered generally[4] currently deductible whether or not incurred during the development or production stages. An expenditure for the acquisition of a right of access cannot be treated for tax purposes identically with an expenditure to render accessible what one already possesses. We, thus, here decide as alternative bases for our decision, that petitioner's payments either fall within the first category, or are excluded from section 616(a) as depreciable assets.

Finally, the same result may be stated in a different fashion: We believe that the origin and character of petitioner's expenditures herein put them into a capital expenditure category and take them out of the "development expenditure" category. See *Woodward v. Commissioner*, 397 U.S. 572, 577 (1970); *United States v. Gilmore*, 372 U.S. 39, 49 (1963); *Madden v. Commission-*

---

[4]Under sec. 616(a), expenses attributable to the acquisition or improvement of depreciable property described in sec. 167 and, under the holding of *Geoghegan & Mathis, Inc. v. Commissioner*, 55 T.C. 672, 676 (1971), affd. 453 F.2d 1324 (6th Cir. 1972), expenses allocable to the acquisition of rights of access are still not currently deductible.

*er*, 514 F.2d 1149, 1151 (9th Cir. 1975), revg. 57 T.C. 513 (1972). Compare *Soelling v. Commissioner*, 70 T.C. 1052, 1055 (1978).

The final issue with which we must deal is the current or capital nature of petitioner's expenditures to remove yellow fill from its mines and deposit it on the Grantville property. Respondent argues that these expenditures are capital because the Grantville property was improved by the deposits and because petitioner has failed to carry its burden of proof that respondent was erroneous in his determination. Petitioner argues that it was not in the business of land development and that dumping the yellow fill on its own land was the only practical method of disposing of it. Petitioner also argues that, while it concedes that the Grantville property was rendered incidentally more valuable because it was rendered potentially developable for industrial or commercial use, the property was not *presently* developable because it lacked adequate sewer facilities. Thus, petitioner argues that the waste transfer costs are deductible as (1) costs of goods sold, (2) ordinary and necessary business expenses (sec. 162), and (3) mine development expenses (sec. 616(a)).

Clearly, the cost of removing the yellow fill from petitioner's minesite was an "ordinary and necessary" business expense. If the fill were not removed it would eventually choke and clog the minesite so that mining operations would perforce cease. If petitioner had paid another to remove the waste, or if it had dumped its waste upon another's land and paid a fee for this right, these costs would be deductible. The method of disposal fixed upon by petitioner, by which the waste fill was dumped upon land petitioner owned rather than land owned by another, cannot, therefore, be determinative. Any benefit petitioner may, or may not, at some future time enjoy as a result of this mode of waste removal is conjectural. Any current benefit petitioner may, or may not, enjoy by virtue of its chosen method of waste disposal is clearly incidental. While the business purpose of the removal operations is obvious, the captial effect, if any, is, at least on the record before us, not. To disallow the expense to petitioner because it used its own land as a dumping site instead of paying another for dumping rights would be unreasonable. In parlance of the day, petitioner chose the most cost effective way of disposing of the fill and should not be punished, taxwise, for so doing. Further, the fact that petitioner acquired a "land

development" grading, as opposed to merely a dumping, permit is irrelevant. It was easier to acquire a land development grading permit, and so this is what petitioner acquired. The tax law does not require that a business be run inefficiently. We find that these expenditures are deductible under section 162. Because we disposed of this claim under section 162, we need not reach petitioner's alternative arguments.

*Decision will be entered under Rule 155.*